Leo A. QUINN, Appellant,

v.

SYRACUSE MODEL NEIGHBORHOOD CORPORATION; Peter White, Individually and in his capacity as Executive Director of Syracuse Model Neighborhood Corporation; Lee Alexander, Individually and in his capacity as Mayor of the City of Syracuse; David S. Michel, Individually and in his capacity as Commissioner of the Department of Community Development for the City of Syracuse; John Mungovan, Individually and in his capacity as Deputy Commissioner of the Department of Community Development for the City of Syracuse and the City of Syracuse, Appellees.

No. 576, Docket No. 79–7561.

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1979.

Decided Jan. 8, 1980.

---

William R. Morgan, Syracuse, N. Y., for plaintiff-appellant.

David M. Garber, Syracuse, N. Y. (James L. Gelormini, Syracuse, N. Y., of counsel), for defendants-appellees City of Syracuse, Lee Alexander, David S. Michel and John Mungovan.

William S. Andrews, Syracuse, N. Y., for defendants-appellees Syracuse Model Neighborhood Corp. and Peter White.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

KAUFMAN, Chief Judge:

The "liberty" protected by the Fourteenth Amendment against arbitrary governmental interference is a necessarily amorphous concept, which continues to

evolve as courts apply it to the specific circumstances of individual cases. Thus, where an infringement of a constitutionally protected interest in "liberty" is alleged, it is essential that a litigant be afforded a reasonable opportunity to prove facts which, taken together, state a claim. Summary dismissal of alleged Fourteenth Amendment violations based on deprivations of this interest, therefore, is appropriate only when prior case law leaves no doubt that the defendant must prevail as a matter of law. In the instant case, we hold that the district court granted summary judgment prematurely and denied plaintiff a meaningful opportunity to prove that his liberty interest has been unlawfully infringed.

## I.

■ The appellant, Leo A. Quinn, seeks damages under 42 U.S.C. § 1983 for Fourteenth Amendment violations arising from his discharge as Rehabilitation Director of the Syracuse Model Neighborhood Corporation (SMNC).[1] Because Quinn's claims were dismissed on summary judgment, the facts underlying this case must be considered in a light most favorable to him.

SMNC was organized in 1971 as the instrument through which urban redevelopment in Syracuse would be accomplished. The Corporation was charged with acquiring and rehabilitating residential properties in declining neighborhoods for rental to low and moderate income families. At first, the lion's share of SMNC's funding was provided by the federal government subject to the approval of the City Department of Community Development. Moreover, Mayor Lee Alexander, an appellee here, apparently had authority to name the original members of the SMNC Board of Directors. Among his initial selections was Leo Quinn who, as a skilled carpenter and longtime business agent of the local carpenters' union, brought to the Board both technical knowledge and important ties to organized labor.

The Board's early business included the appointment of an executive director. Quinn resigned his seat on the Board to seek this post, but was passed over in favor of appellee Peter White. Nevertheless, Mayor Alexander and the Board were sufficiently impressed with Quinn that they instructed White to offer him a position as Rehabilitation Director, the second-ranking employee of SMNC. Although he had not yet been officially hired, White communicated the offer to Quinn at a luncheon meeting. Quinn hesitated, understandably reluctant to leave his secure position with the union. White, however, assured Quinn that "as long as we were funded and did our job, we could probably be there forever." He went on to assert that federal funding was guaranteed for a number of years and that, in the not-too-distant future, SMNC would become self-sufficient, relying solely on rents collected from rehabilitated properties. From this conversation, Quinn inferred a mutual understanding that his position would be tenured, as consideration for relinquishment of his union job. On this basis, Quinn accepted the position as Rehabilitation Director, and was "formally" notified of his "appointment" in a letter from SMNC dated June 23, 1972. The letter was silent concerning the precise terms of his employment. Four days later, however, the SMNC Board promulgated a "Staff Handbook," which stated that "staff is hired on a probationary status for a period of 90 days. During this time, the individual or agency may terminate the relationship." For Quinn, this statement reaffirmed his expectation of "tenured" employment.

---

1. SMNC is a not-for-profit corporation created under New York law. At all times relevant to this suit, the vast majority of its funding was provided by the federal government and allocated by the City of Syracuse. The district court apparently assumed, for purposes of summary judgment, that SMNC acted "under color of state law" as required by 42 U.S.C. § 1983, and that its actions constitute "state action" under the Fourteenth Amendment. We do not have occasion to resolve this question here, but we contemplate that the district court will address it at an appropriate juncture below.

Quinn began his work for SMNC in late June 1972, and remained there until February 16, 1976. Initially, his annual salary was $16,000, but it was gradually increased to $18,900 by 1976. His duties, which he performed competently, included inspection of buildings for possible purchase by SMNC, supervision of rehabilitation and continuing maintenance, preparation of grant requests, and development of work schedules.

In the Spring of 1975, White and Quinn learned that some SMNC funds could not be accounted for. Neither man reported the shortage at that time but, following an audit conducted in late 1976, independent accountants reported to the Mayor and Commissioner of Community Development David S. Michel that approximately $18,000 in tenant rent payments could not be located. Immediately thereafter, the Syracuse Police Department seized the financial records of SMNC.

Appellee Michel and his deputy, appellee John Mungovan, then attempted to elicit an explanation from White, Quinn, and SMNC treasurer James Barbour. When none was forthcoming, Michel notified the SMNC Board, by letter dated January 12, 1976, that "the Mayor has requested that all further Community Development funding . . . be suspended until the police investigation is completed." A series of meetings with SMNC officials followed, as a result of which Michel, Mungovan, and Alexander demanded the resignations of White, Quinn, and Barbour as a prerequisite to restoring funding. Michel informed the SMNC Board of this decision on January 20, in a letter explaining that the City had "lost confidence" in the SMNC administration. Michel "emphasized" that "this position does not imply that criminal actions have occurred but only responds to the clear evidence that there is a complete lack of administrative control."

On January 26, SMNC Board Chairman Laurence Hoefler responded in a letter to Mayor Alexander. He informed the Mayor that the resignations of White and Barbour had been requested, secured, and, in the case of Barbour, accepted. Although White's resignation would be held "in abeyance," it was "the feeling of the Board that at this time there is no reason to warrant our asking for the resignation of Mr. Quinn." For his part, Quinn maintained that his duties were wholly unrelated to the financial affairs of SMNC, and that tendering his resignation would amount to an unwarranted admission of guilt. Nevertheless, the City, speaking through Michel, rejected the Board's decision concerning Quinn, and advised on January 27 that all funding would be permanently terminated in 30 days if Quinn were not dismissed.

In addition, the City began a publicity campaign designed to coerce the SMNC Board to fire Quinn. A series of articles appeared in the local Syracuse press suggesting that Quinn was responsible for the missing funds. For example, the *Syracuse Herald Journal* reported that Alexander and Michel had called for the dismissal of Quinn, but that White's resignation had not been accepted because he was "cooperating." Similarly, under headlines such as "Mayor Calls for Firing" and "Hint, Criminal Case," the *Syracuse Post-Standard* informed its readers that the case had "taken on a criminal aspect," specifically mentioning Quinn. Also during this period, Mayor Alexander told at least one city legislator that Quinn was not cooperating with the criminal investigation, and would be fired.

Faced with this publicity and the threatened termination of its financial support, the SMNC Board dismissed Leo Quinn on February 16. One week later, the City restored all funding to the Corporation. At about the same time, a grand jury was impaneled to consider possible criminal charges against Quinn and others, an event that attracted considerable media attention. The cumulative result of this publicity, according to the affidavit of City Counselor Vincent O'Neill, "left in the minds of many the erroneous impression that plaintiff was guilty of incompetence, mismanagement or even possibly some type of criminal activity."

The Grand Jury reported the results of its investigation the following April, con-

cluding that no criminal prosecutions were warranted. Significantly, it affirmatively stated that Quinn had no responsibility for the financial management of SMNC, that he was wrongfully discharged, and that he should be reinstated. After a number of unsuccessful attempts to win reinstatement, Quinn initiated a state court action, which is still pending, seeking restoration and back pay. On June 20, 1978, more than two years after his discharge, Quinn also commenced the instant suit in federal court under 42 U.S.C. § 1983, alleging deprivations of his liberty and property without due process of law. He named as defendants the City, SMNC, White, Alexander, Michel, and Mungovan, requesting several million dollars in damages from each. In his complaint, he alleged that his "wrongful discharge" by SMNC and the activities of the other defendants, including the City of Syracuse, were deliberate acts "designed to create the public impression that plaintiff was in some manner responsible for the shortage of funds . . . and that the problem of said shortage of funds was being solved with [his] termination." The complaint further stated that Quinn had been a "permanent employee of defendant, SMNC, with the understanding that he would remain so employed as long as he faithfully performed his duties and the defendant corporation remained in existence." Accordingly, the complaint asserted that Quinn's dismissal, without a prior hearing, deprived him of his liberty and property without due process.

Immediately after filing his complaint, Quinn served notices to take the depositions of all defendants. They, in turn, declined to comply, largely because they deemed the requested material "irrelevant." Instead, the City defendants (the City, Alexander, Michel, and Mungovan) and the SMNC defendants (SMNC and White) filed motions to dismiss for failure to state a claim. Their moving papers included a sizeable number of documents disputing several of Quinn's factual arguments. Yet, on August 30, the City defendants advised Quinn that they considered "responses to your discovery notices stayed pending determina-

tion of our motion to dismiss." On September 11, oral argument on these motions was heard by Judge Munson who, at the close of the proceeding, announced that he might treat the motions as requests for summary judgment pursuant to Fed.R.Civ.P. 56. He apparently opted for this course, because on December 12, the defendants filed additional materials in support of summary judgment. On December 27, Quinn filed papers in opposition, including affidavits sworn by Quinn, Barbour, O'Neill, and two former SMNC directors, as well as the Grand Jury Report. Quinn never obtained compliance with his discovery demands from any of the defendants. Nevertheless, Judge Munson granted summary judgment to all defendants on June 5, 1979. It is this decision that is before us.

## II.

The able district court judge found that, at best, Quinn had alleged "merely" that he "was discharged . . . amid the publicity surrounding a scandal involving missing funds." *Quinn v. Syracuse Model Neighborhood Corp.*, No. 78–CV–293, slip op. at 7 (N.D.N.Y. June 5, 1979). He failed to submit any proof, according to Judge Munson, suggesting that "a City official made any outright charge of immoral or illegal conduct against plaintiff to the public, or in private for that matter." *Id.* This, he concluded, was fatal to Quinn's claim that he had been deprived of a constitutionally protected interest in "liberty."

## A.

■ Assuming for the moment that the district court correctly explicated the applicable law, we are compelled to conclude that summary judgment was not warranted on the record before us. Fed.R. Civ.P. 56(c) provides that summary judgment is appropriate only when a review of the entire record demonstrates "that there is no genuine issue as to any material fact." The burden, therefore, is on the moving party to establish that no relevant facts are in dispute. See *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319

(2d Cir. 1975); *accord, Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Indeed, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman, supra*, 524 F.2d at 1320; *accord*, 6 *Moore's Federal Practice* ¶ 56.02[1] (2d ed. 1976). Thus, when the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate. Indeed, it is the very purpose of the trial to establish which party's version of the contested circumstances best comports with reality.

█ We are not unmindful that, properly employed, summary judgment is a useful device for unmasking frivolous claims and putting a swift end to meritless litigation. *See Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 278 (2d Cir. 1967), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); 6 *Moore's Federal Practice* ¶ 56.-15[1.–0] (2d ed. 1976). Thus, the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party. *See Gatling v. Atlantic Richfield Co.*, 577 F.2d 185, 187–88 (2d Cir. 1978), *cert. denied*, 439 U.S. 868, 99 S.Ct. 181, 58 L.Ed.2d 169 (1979). The litigant opposing summary judgment, therefore, "may not rest upon mere conclusory allegations or denials" as a vehicle for obtaining a trial. *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.

█ We hold that Quinn fulfilled this obligation in the instant case. He alleged that the appellees engineered a purposeful campaign to thrust upon him the onus of responsibility for the missing funds. In support of this contention, Quinn has produced newspaper accounts that imply that he was the culprit. These reports, moreover, refer to statements made by appellees Michel and Alexander. In addition, Quinn has submitted affidavits alleging that all defendants took part in meetings at which his dismissal was discussed, and that at least one defendant privately advised a city official that Quinn had not cooperated with police. Finally, the existence of a criminal investigation, the press reports linking Quinn with that investigation, and the role of the defendants in initiating a criminal inquiry all make it arguable that they openly charged Quinn with illegal and immoral conduct.

█ Quinn's showing appears stronger still in light of defendants' successful efforts to resist discovery. Judge Munson's decision, after oral argument on the motions, to treat defendants' motions as a request for summary judgment denied plaintiff a reasonable opportunity to elicit information within the control of his adversaries. At least when the party opposing the motion has not been dilatory in seeking discovery, summary judgment should not be granted when he is denied reasonable access to potentially favorable information. *See Schoenbaum v. Firstbrook*, 405 F.2d 215, 218 (2d Cir. 1968) (en banc), *cert. denied sub nom., Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Illinois State Employees Union v. Lewis*, 473 F.2d 561, 565 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); 6 *Moore's Federal Practice* ¶ 56.-15[5]; *cf.* Fed.R.Civ.P. 56(f). *See generally, Judge v. City of Buffalo*, 524 F.2d 1321 (2d Cir. 1975).

### B.

[11] We are also of the view that Judge Munson incorrectly formulated the legal criteria by which Quinn's factual claims must be judged. The "liberty" protected by the Fourteenth Amendment is "broad indeed," *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and the standard employed below is

an unduly restrictive interpretation of this most basic constitutional guarantee.

It is well-settled that an individual's liberty can be implicated when a governmentally imposed stigma restricts his ability to seek and obtain employment. This "broad and majestic" principle, *Roth, supra*, 408 U.S. at 571, 92 S.Ct. 2701, embraces interference with "the right of the individual to contract, to engage in any of the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). And it is also established that such governmental action cannot be undertaken unless the individual is afforded an opportunity to be heard and to "clear his name." *Roth, supra*, 408 U.S. at 573 n. 12, 92 S.Ct. 2701, *accord, Wisconsin v. Constantineau*, 400 U.S. 433, 436, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).[2]

The case law has set forth a number of elements which, taken together, constitute a protected interest in liberty. This court stated these requisites succinctly in *Gentile v. Wallen*, 562 F.2d 193, 197 (2d Cir. 1977): "to constitute deprivation of a liberty interest, the stigmatizing information must be both false . . . and made public . . . by the offending governmental entity." For the purpose of surviving a motion for summary judgment, Quinn's complaint and supporting papers satisfy these requirements.[3]

The information involved must, initially, be stigmatizing. *Roth, supra*, 408

U.S. at 573, 92 S.Ct. 2701. It must, therefore, call into question the plaintiff's "good name, reputation, honor, or integrity." *Constantineau, supra*, 400 U.S. at 437, 91 S.Ct. at 510. In this case, if Quinn can prove the facts he alleges, he will have established a governmentally imposed stigma. He claims that the defendants, acting in concert, labored to create a public impression that he was criminally responsible for the missing funds. As a result, his complaint states, he "continued to suffer great damage to his reputation; his standing in the community has been greatly affected; he has become an object of derision and a target for innuendo and he has been forced to endure great emotional pain and suffering." These allegations are reiterated in Quinn's affidavit in opposition to summary judgment, in which he states he has "encountered countless references to the missing money and my dismissal in both employment and social relationships." [4]

In addition, the cases require that the allegations giving rise to the stigma be false. *Gentile, supra*, 562 F.2d at 197; *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). In the instant case, Quinn has steadfastly maintained that he had no involvement whatever in the financial affairs of SMNC, and the subsequent Grand Jury Report lends credence to his claim.

Further, the offending governmental entity or actor must make these

---

**2.** Appellees' contention that a hearing is the sole remedy available to appellant for deprivation of his liberty is without merit. *See Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978) ("the denial of procedural due process should be actionable for nominal damages without proof of actual injury").

**3.** It is not seriously disputed that Quinn's complaint fulfills the mandate of *Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), that the alleged imposition of a stigma "occur in the course of the termination of employment."

**4.** The district court, relying on *Roth v. Board of Regents*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), suggested that "the charges must involve imputations of illegal, dishonest,

or immoral conduct." *Quinn v. Syracuse Model Neighborhood Corp.*, No. 78–CV–293, slip op. at 7 (N.D.N.Y. June 5, 1979). Since Quinn alleges that defendants accused him of criminal conduct, his complaint would survive an application of this restrictive view of *Roth*. Still, we are constrained to note that the relevant language in *Roth* is prefaced by the crucial phrase "for example." 408 U.S. at 573, 92 S.Ct. 2701. Our review of analogous cases indicates that stigmatizing information is not limited to charges of illegality, dishonesty or immorality. *See, Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed. 725 (1975) (suspension from school on grounds of misconduct stigmatizing); *Lombard v. Board of Education*, 502 F.2d 631 (2d Cir. 1974) (charge of mental illness stigmatizing).

false and stigmatizing charges "public." *Gentile, supra*, 562 F.2d at 197; *Codd, supra*, 429 U.S. at 628, 97 S.Ct. 882; *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). The district court held that Quinn failed to satisfy this requirement because he had not demonstrated that "a City official made any *outright* charge." *Quinn, supra*, slip op. at 7 (emphasis added). Apparently, the district judge would demand an explicit public statement by a municipal official accusing the discharged employee of "immoral or illegal" conduct. The cases, however, do not support such a principle. A subtle campaign designed by city officials to make plaintiff the scapegoat for an episode of municipal misfeasance may impose no less an indelible stigma than a public proclamation announced at high noon from the steps of City Hall. Indeed, a carefully conceived scheme of suggestion and innuendo may be all the more devastating to individual liberty because it is more difficult to refute, especially when its architects sit in the highest offices of local government. *Codd v. Velger* simply requires dissemination of a "false and defamatory *impression*," not a detailed bill of particulars. 429 U.S. at 628, 97 S.Ct. 882 (emphasis added). Such an impression was arguably created here, at least for purposes of defeating summary judgment.[5] *See Birnbaum v. Trussell*, 371 F.2d 672 (2d Cir. 1966).

### III.

Judge Munson's decision that Quinn lacked a protected "property" interest in his job stands on a different footing. The judge held that a property interest is defined by reference to state law. *Quinn, supra*, slip op. at 7 (quoting *Bishop, supra*, 426 U.S. at 344, 96 S.Ct. 2074). Thus, he looked first to the New York Not-For-Profit Corporation Law which, in Section 714(a),

provides that "[a]ny officer elected or appointed by the board may be removed by the board with or without cause." Section 714(b), however, adds that "[t]he removal of an officer without cause shall be without prejudice to his contract rights, if any." Judge Munson, therefore, examined New York contract law and concluded, based primarily on *Weiss v. Opportunities for Cortland County, Inc.*, 40 A.D.2d 45, 337 N.Y. S.2d 409, 411–12 (3d Dept. 1972), that "unless there is a definite period of employment specified by contract, the hiring is one at will." Accordingly, he held that Quinn has no cognizable property interest in his employment. We believe that this conclusion is sound.

"Property" protected by the Fourteenth Amendment is, like liberty, potentially all-embracing. *Roth, supra*, 408 U.S. at 571, 92 S.Ct. 2701. Although the long line of cases under Section 1983 attempting to pour content into this concept is confusing at best, there appears to be general agreement that a property interest arises only when an individual possesses "a legitimate claim of entitlement" to continued job tenure. *Id.* at 577, 92 S.Ct. 2701. The requisite origin of this "entitlement" is unsettled, but it apparently must arise from "existing rules or understandings that stem from an independent source such as state law." *Id.* The Supreme Court has suggested, on occasion, that state law is the sole vehicle for the creation of property rights, *Bishop, supra*, 426 U.S. at 344, 96 S.Ct. 2704, but it has, more recently, instructed that "federal constitutional law determines whether [an] interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). *See generally*, Monaghan, *Of "Liberty" and "Property,"* 62 Cornell L.Rev.

---

5. The appellees raise a number of factual issues, none of which can be resolved in this court. They claim, for example, that any stigma resulted from the "tone" of newspaper accounts, not from their specific statements. Further, they allege that any stigma has been erased by the Grand Jury Report, which vindi-

cated Quinn's reputation. These factual disputes as well as questions concerning the appellees' "good faith" and actual involvement in the alleged "conspiracy," must await resolution by the trier of fact. *See Gentile v. Wallen*, 562 F.2d 193, 195 n.2 (2d Cir. 1977).

405, 434–44 (1977). Thus, although the primary source of property rights is state law, the state may not magically declare an interest to be "*non* property" after the fact for Fourteenth Amendment purposes if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit. *See, e. g., Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Demorest v. City Bank Farmers Trust Co.*, 321 U.S. 36, 42–43, 64 S.Ct. 384, 88 L.Ed. 526 (1944).

 In the case before us, Quinn asserts that summary judgment was inappropriate because the presence of a "legitimate claim of entitlement" remains a disputed question of fact. He alleges that the Staff Handbook, together with White's assurances on behalf of the SMNC Board, gave rise to a mutual expectation of continued employment analogous to that enjoyed by the probationary teacher in *Perry, supra*. But *Perry* recognized that if state law had previously provided that "no contractual or other claim to job tenure" existed, the teacher would have enjoyed no protected property interest. 408 U.S. at 602 n.7, 92 S.Ct. at 2700. If the state has not attempted to wrest a governmental benefit from an individual claimant through definitional gamesmanship, and state law clearly rejects any inference of legitimate entitlement, a mutual understanding not grounded in state law is of no consequence. Here, the relevant statute stated, at the time Quinn was hired, that he could be discharged "with or without cause," absent specific contract rights to the contrary. Moreover, Judge Munson concluded, and our review of New York law confirms, that the duration of an employment contract in New York must be set forth explicitly, or it shall be terminable at will. *See, e. g., Haines v. City of New York*, 41 N.Y.2d 769, 396 N.Y. S.2d 155, 158, 364 N.E.2d 820, 822 (1977); *Whitley v. Pacific Industries, Inc.*, 28 A.D.2d 147, 283 N.Y.S.2d 525, (1st Dept.), *aff'd*, 22 N.Y.2d 726, 292 N.Y.S.2d 112, 239 N.E.2d 207 (1967); *Parker v. Borock*, 5 N.Y.2d 156, 182 N.Y.S.2d 577, 579, 156 N.E.2d 297, 298 (1959); *Watson v. Gugino*, 204 N.Y. 535, 98 N.E. 18 (1912). Thus, even if Quinn could prove the existence of an oral understanding, his claim would fail as a matter of law. Accordingly, insofar as Quinn alleged a protected property interest, summary judgment was properly entered.

## IV.

Before concluding, we must resolve two other issues addressed by Judge Munson below.

## A.

 In a footnote, the district court granted summary judgment for appellee City of Syracuse, on the ground that Quinn had not alleged an "official municipal policy" as required by *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To be sure, "the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." *Id.* at 690, 98 S.Ct. at 2036. But although the Supreme Court in *Monell* declared that a municipality cannot be held liable "on a *respondeat superior* theory," *id.* at 691, 98 S.Ct. 2018, it explicitly recognized that a "government's policy or custom" may be promulgated either "by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. at 2038. Quinn has alleged the implementation of a deliberate scheme to invoke municipal authority in an effort to hold him responsible for the missing funds, a plan approved by the Mayor and the Commissioner of the relevant municipal department. Surely the mayor is the one city official whose edicts and acts represent municipal policy, especially when he joins other high-ranking municipal officers in devising and successfully implementing the plan. We hold that if Quinn can prove that Mayor Alexander directed such a campaign to stigmatize Quinn, he will have stated a claim for municipal liability under 42 U.S.C. § 1983. *See Owens v. Haas*, 601 F.2d 1242 (2d Cir. 1979).

### B.

Finally, we must determine the appropriate statute of limitations to govern suits against New York municipalities under § 1983, a question Judge Munson did not address below.[6] The three-year limitations period embodied in New York Civil Practice Law and Rules § 214(2) has traditionally governed § 1983 suits against individuals, see note 6 supra, but we have not, until now, had occasion to pass on the period applicable to claims against municipalities.[7] Our point of reference, of course, is the law of New York, since where "there is no specifically or otherwise relevant federal statute of limitation . . . the controlling period would ordinarily be the most appropriate one provided by state law." Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975).

Quinn contends that, by analogy to § 1983 suits against individuals, the most appropriate period is the three-year limitation imposed by § 214(2) for actions "to recover upon a liability, penalty or forfeiture created or imposed by statute." The City of Syracuse, by contrast, urges adoption of the one year and 90 day provision of New York General Municipal Law § 50–i(1), which applies to suits "for personal injury or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such city . . . or of any officer, agent or employee thereof." If the City is correct, Quinn's claim against it is time-barred.

We hold, however, that the § 214(2) limitations period governs suits under § 1983, regardless of the legal status of the defendant under New York law. In Monell, supra, the Supreme Court held that a municipality is a "person" for purposes of § 1983. Since 1963, this court has consistently stated that § 214(2) applies in § 1983 suits against "persons," see Swan v. Board of Higher Education, 319 F.2d 56 (2d Cir. 1963), even though § 50–i(1) includes, within its terms, city officers, agents and employees. To create different limitations periods for two similarly situated classes of defendants would create a distinction without a difference, and would engender unnecessary confusion for litigants and judges alike. Thus, we hold that the most appropriate limitations period for suits against municipalities under § 1983 is that which has been heretofore applied in actions against individual municipal officers and employees.

The judgment is reversed and the case remanded to the district court for further proceedings consistent with this opinion.

---

**6.** Judge Munson did not reach this question because he could discern no municipal policy on which to base § 1983 liability, regardless of the applicable statute of limitations.

Appellees' argument that the one year and 90 day period set forth in N.Y.Gen.Mun.Law § 50–i(1) governs claims for damages against individuals under § 1983 must fall before the unbroken line of cases applying the three-year limitations period of N.Y.Civ.Prac.Law and Rules § 214(2) to such claims. See, e. g., Leigh v. McGuire, 613 F.2d 380 (2d Cir. 1979); Meyer v. Frank, 550 F.2d 726 (2d Cir.), cert. denied, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977); Swan v. Board of Higher Education, 319 F.2d 56 (2d Cir. 1963). Indeed, we note that recent developments suggest the applicability of N.Y.Civ.Prac.Law and Rules § 213(1), the six-year residual statute of limitations, to suits arising under 42 U.S.C. § 1983. Compare State v. Cortelle Corp., 38 N.Y.2d 83, 378 N.Y.

S.2d 654, 655, 341 N.E.2d 223, 224 (1975) (Breitel, C. J.) (§ 214(2) does not apply to "[s]tatutory provisions which provide only additional remedies or standing [but] do not create or impose new obligations") with Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508, 523 (1979) ("by its terms, as well as its history, [§ 1983] does not provide any rights at all.")

**7.** In Fine v. City of New York, 529 F.2d 70, 76 (2d Cir. 1975), we suggested, in dictum, that N.Y.Gen.Mun.Law § 50–i(1) "would appear to be the most appropriate" period of limitations for suits against municipalities based squarely on the Fourteenth Amendment. This question is not before us, and our cautious suggestion in Fine in no wise answers the question as to the appropriate limitations period for § 1983 suits against municipalities.