NEW ALLIANCE PARTY, Dr. Lenora B. Fulani, Dr. Fred Newman and Dr. Rafael Mendez, Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION, Louis F. Freeh, as Director of the Federal Bureau of Investigation, James M. Fox, as Acting Director in Charge of the FBI New York Division, and Janet Reno, as United States Attorney General, Defendants.

No. 93 Civ 3490 (CBM).

United States District Court, S.D. New York.

July 28, 1994.

Arthur Block, New York City, for plaintiffs.

Mary Jo White, U.S. Atty. for the So. Dist. of New York by Robert W. Sadowski, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

### FACTS

Plaintiff New Alliance Party ("NAP") is a national political party whose candidates have sought elective office in several local and statewide campaigns since its founding in 1979. The party gained national prominence when Dr. Lenora Fulani, a founding member, launched presidential campaigns in 1984, 1988 and 1992. During her 1988 and 1992 campaigns, Dr. Fulani became the first African–American woman to appear on the ballot in all fifty states and the District of Columbia. She was also the first member of any party qualified by the Federal Election Commission ("FEC"), ranking first in the number of Americans who contributed to her campaign. Comp. ¶ 9; Ex. B to Defendant's Notice of Motion ("FBI Motion").

Three years after the 1988 presidential campaign, NAP requested copies of documents from the FBI's investigative file under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7). At that time, plaintiffs learned of an FBI investigation of NAP's activities initiated "in the very month that the FEC certified Dr. Fulani for primary matching funds for her 1988 race." Comp. ¶ 9; FBI Motion, Ex. B. Since learning of the investigation, NAP has received several internal FBI documents summarizing NAP's activities and its public profile. Ex. A to the Declaration of Arthur R. Block dated March 28, 1994 ("Block Decl. II").

The gravamen of plaintiffs' complaint is that the FBI characterized NAP as a "political cult" whose members are "armed and dangerous" and undertook to investigate NAP believing it to be a cult. The FBI initiated a preliminary investigation of NAP in 1988, after receiving a communication from its Phoenix field office that a "confidential source ... alleged that certain members

of [ ] NAP had access to weapons and that some individuals advocated robbing banks and killing police officers." Ex. A to the Declaration of Mark V. Rich dated September 14, 1993 ("Rich Decl."). After conducting a four-month investigation, the FBI concluded that this information could not be corroborated and the investigation was ended. *Id.*

On May 16, 1988, the New York Field Office transmitted a report to FBI headquarters summarizing the results of the four-month investigation. The report concluded that "[n]o further information has been developed which characterizes NAP as none other than a political/cult organization using social outreach to recruit support." Comp. ¶ 2. Ex. R to the Declaration of Arthur R. Block dated August 30, 1993 ("Block Decl. I").

The FBI claims that it has not investigated NAP's activities since the 1988 investigation ended. Rich Decl., Ex. A. However, NAP disputes their claim, alleging that "[i]n July 1991, the FBI's Indianapolis, Indiana field office initiated an investigation of NAP based solely upon protected First Amendment activities of Dr. Fulani and other NAP members." Comp. ¶ 27. The evidence shows that the FBI responded to an inquiry from its Indianapolis Field Office ("FBI Indianapolis") concerning NAP's activities after that office received a newspaper article describing the party's affiliation with M–19, a Columbian political party formerly engaged in terrorist activities. Block Decl. II., Ex. B.

The FBI responded to the inquiry by sending FBI Indianapolis a copy of two newspaper articles on NAP obtained from its files. The FBI also summarized the 1988 investigation as follows:

> FBI PHOENIX INITIATED A PRELIMINARY INQUIRY ON THE NAP IN JANUARY, 1988, WHEN A SOURCE OF UNKNOWN RELIABILITY ALLEGED THAT THIS GROUP WAS INVOLVED IN ACTIVITIES THAT ADVOCATE THE OVERTHROW OF THE U.S. GOVERNMENT BY ANY MEANS POSSIBLE, TO INCLUDE FORCE OR VIOLENCE. MEMBERS OF THE NAP SHOULD BE CONSIDERED ARMED AND DANGEROUS AS THEY ARE KNOWN TO POSSESS WEAPONS. THIS INQUIRY WAS CLOSED ON APRIL 7, 1988, DUE TO THE FACT THAT NO AND/OR INSUFFICIENT INFORMATION WAS DEVELOPED PERTAINING TO THE NAP OR ITS MEMBERS TO SUBSTANTIATE THE SOURCE'S ALLEGATIONS WHICH WOULD HAVE JUSTIFIED CONTINUING THE INVESTIGATION UNDER THE ATTORNEY GENERAL GUIDELINES. Block Decl. II, Ex. B.

Finally, the FBI requested that FBI Indianapolis "remain in contact with [deleted under FOIA] for any information" that NAP and M–19 might be planning "forceful and/or violent acts in the United States to overthrow the government." Block Decl. II, Ex. B. After receiving this response, FBI Indianapolis "conclud[ed] that no investigation was warranted, and none was conducted." Rich Decl., Ex. A.

Plaintiffs have requested a declaratory judgment declaring that "defendants' description of a group of persons as a 'cult,' or its use of such a description as the predicate or justification for investigative activities, use of force, criminal prosecution, or governmental regulation is a violation of the First, Fourth, and Fifth Amendments of the Constitution of the United States." Comp. ¶ 1. In response, defendants moved to dismiss the complaint, arguing that: (1) this court lacks subject matter jurisdiction under Rule 12(b)(1) of the Fed.R.Civ.P.; and (2) plaintiffs have failed to state a claim under Rule 12(b)(6) of the Fed.R.Civ.P.

After hearing defendants' motion, by order dated November 17, 1993, the court converted defendants' motion to a motion for summary judgment. Subsequent to that order, the court heard oral argument on the motion and considered additional affidavits and evidence submitted by the parties.

Based on the pleadings submitted and the evidence presented by both parties, this court finds that defendants are entitled to summary judgment because plaintiffs' allegations are insufficient to find constitutional standing on plaintiffs' part to bring this ac-

tion. The injuries alleged in the complaint are not specific enough to meet the constitutional standard set by the Supreme Court in *Laird v. Tatum* and its progeny. Plaintiffs' have failed to trace their alleged injuries directly to the FBI investigation and the "cult" characterization. Moreover, the relief which plaintiffs seek goes far beyond the scope of the injuries allegedly sustained.

### DISCUSSION

#### Standards for Summary Judgment

■ It is well-established in the Second Circuit that a Rule 12(b)(6) motion is addressed to the face of the pleadings. *See, Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). Upon receiving a 12(b)(6) motion, the court, in the exercise of its discretion, may convert the motion to one for summary judgment and afford all parties the opportunity to present supporting evidence. *Fonte v. Board of Managers of Continental Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988).

■ A court may grant summary judgment only if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The essential inquiry in considering a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so "one-sided" that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202, 213–15 (1986). Plaintiffs may not defeat defendants' summary judgment motion by merely offering a "scintilla of evidence" as to their alleged injury. They must present evidence upon which a jury could reasonably find in their favor. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214–15. Additionally, plaintiffs may not file a complaint in this court without having made a reasonable investigation of the facts. Fed. R.Civ.P. 11.

#### Constitutional Standing

Defendants assert that plaintiffs lack standing to bring this cause of action. According to defendants, plaintiffs have not al-

leged a concrete harm that is recognizable by the court nor have they shown that their alleged injuries are directly traceable to the FBI investigation. As a result, plaintiffs have failed to assert facts which entitle them to the relief which they seek.

Article III of the United States Constitution restricts federal court jurisdiction to "cases" and "controversies." To bring a case in federal court, the complainant must have standing, or show that "she has sustained or is in immediate danger of sustaining a direct injury" resulting from the action of which she has complained. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700, 709 (1982); *Ex Parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

■ In a series of decisions, the Supreme Court has identified three elements that are necessary to find constitutional standing: (1) the plaintiff must prove that she has suffered some actual or threatened injury; (2) the injury must be specifically traceable to the challenged action; and (3) the remedy sought must redress her injury. *See Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2142, 119 L.Ed.2d 351 (1992); *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66, 89 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450, 460 (1976). After carefully reviewing the complaint, the supporting memoranda and the affidavits submitted by the parties, plaintiffs have failed to meet their burden of establishing the elements necessary to find constitutional standing.

A. *No Proof of An Actual Or Threatened Injury*

■ In determining whether an actual injury has occurred, the Supreme Court has reminded that the alleged injury must be "concrete and particularized" to the individual or organization, and not "conjectural or hypothetical." *Lujan,* — U.S. at —, 112 S.Ct. at 2133. Moreover, at the pleading stage, it is presumed that any general allega-

tions raised in the complaint will "embrace those specific facts that are necessary to support the claim." *Id.; Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80, 85 (1957). While plaintiffs admit that standing analysis is based upon the allegations in a complaint, they have failed to raise the factual allegations necessary to find a justiciable controversy in this case.

The statement which lies at the center of this controversy is the FBI's characterization of NAP as "none other than a political/cult organization using social outreach to recruit support." Plaintiffs claim that by "classifying NAP as a 'political cult' rather than acknowledging NAP as a political *party,* [the FBI has] evad[ed] the high degree of constitutional scrutiny to which governmental interference with political activity must be subjected." Comp. ¶ 4. Because of this characterization, NAP further claims that the FBI has "impaired the effectiveness of [its] exercise of [its] constitutional rights of freedom of speech and association, and has caused persons associated with [it] to be 'chilled' in their exercise of their rights of speech and association." Comp. ¶ 5. Finally, plaintiffs claim that the derogatory use of the term "cult" to characterize NAP's activities subject it to the same stigmatizing effect that labels such as "communist," "subversive," and "Black radical" had on past generations.

Federal courts have consistently expressed the strongest disapproval of government interference with an individual's constitutionally-protected activities. *Laird v. Tatum,* 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2326–27, 33 L.Ed.2d 154, 165 (1972); *Socialist Party v. Attorney General,* 419 U.S. 1314, 1318, 95 S.Ct. 425, 427–28, 42 L.Ed.2d 627, 631 (1974). However, courts have recognized the need for preliminary government investigations to further proper law enforcement objectives, even if the activity affects First Amendment freedoms. *See, e.g., Fifth Avenue Peace Parade Committee v. Gray,* 480 F.2d 326, 332 (2d Cir.1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974) (FBI investigation of participants in 1969 Moratorium Demonstration held legitimate exercise of its "responsibility for the maintenance of public safety and order").

For instance, in *Laird,* the Supreme Court rejected individual claims that an army surveillance action "chilled" their First Amendment rights. The Court could not find an injury where the "chilling effect" resulted "merely from an individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some 'other' and additional action detrimental to that individual." 408 U.S. at 11, 92 S.Ct. at 2324, 33 L.Ed.2d at 162. The Court also held that mere "allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of future harm . . . ." *Id.* at 14, 92 S.Ct. at 2325–26, 33 L.Ed.2d at 164. Thus, without concrete evidence of a specific injury, plaintiffs lack sufficient evidence to find a justiciable controversy.

The Court further defined its position in *Socialist Workers Party v. Attorney General of the United States of America, supra,* where it considered an application for a preliminary injunction made by the youth organization of the Socialist Workers Party who sought to enjoin the FBI from "attending, surveilling [sic] listening to, watching, or otherwise monitoring, [its national political] convention." 419 U.S. at 426, 95 S.Ct. at 1315, 42 L.Ed.2d at 629. Plaintiffs complained that the challenged FBI activity would prevent delegates from participating in the convention as well as threaten loss of employment for those attending. *Id.* Rejecting the FBI's interpretation of *Laird,* the Court found that the specificity of the plaintiff's claims were key to determining whether it alleged an actual or direct injury, finding them "sufficient to satisfy the requirements of Art. III." *Id.* at 1318, 95 S.Ct. at 427–28, 42 L.Ed.2d at 631.

NAP claims that the FBI investigation has caused many injuries to the party and its members. According to plaintiffs, the FBI has chilled the First Amendment expression of organizational members (Comp. ¶ 8), supported "political intelligence reports" compiled by private organizations criticizing NAP's activities (Comp. ¶¶ 34–36), and interfered with the party's competitiveness in po-

litical elections by "impairing [its] ability to compete in the electoral process." Comp. ¶¶ 57–58. NAP further alleges that by describing the party as "armed and dangerous," the FBI further stigmatizes the group and "subjects it to government actions to which [it] would otherwise not be subjected." Comp. ¶ 58. NAP's chief concern is that the party will be treated similarly to the Branch Dividian Group, the religious organization whose activities in Waco, Texas were extensively investigated by the FBI prior to its failed attempt to enter the compound in February 1993. Comp. ¶¶ 42–47; NAP Memo. II at 30.

The evidence presented strongly contradicts these allegations. Although the FBI investigation has allegedly chilled the freedoms of expression and association of prominent NAP members, Dr. Fulani has been a presidential candidate in both the 1988 and 1992 Presidential elections and currently hosts a weekly interview program that is cablecast in approximately 25 cities. Comp. ¶ 10. Dr. Newman, a founding member, has run in three major statewide elections, co-hosts the weekly interview program with Dr. Fulani, and has authored numerous publications. Comp. ¶ 10. Finally, Dr. Mendez is a "leading community activist" who received approximately 25% of the citywide vote in his campaign for City Council President, notably outpolling opponents in his Bronx district. Comp. ¶ 12. Obviously, each individual is significantly engaged in First Amendment activities. Thus, based on plaintiffs' own allegations, it is extremely difficult to find that NAP's activities have been curtailed or its membership "chilled" as a result of the FBI investigation.

Furthermore, the court is not persuaded that NAP's public support has deteriorated because of the investigation. To the contrary, plaintiffs stated in a letter to the FBI dated January 14, 1992 that NAP was "the fourth largest national electoral party in the United States." FBI Motion, Exh. B. After announcing her second candidacy for the United States Presidency in February 1991, Dr. Fulani became "the first candidate of any party to be certified by the Federal Election Commission for primary matching funds"

and "ranked first in the number of Americans who have contributed to her campaign...." FBI Motion, Exh. B. Thus, in spite of the 1988 investigation, NAP has continued to enjoy strong political support, contradicting its assertions that "persons associated with [the party are] chilled in their exercise of their right of speech and association." Comp. ¶ 8.

■ Defendants' contend that the preliminary investigation fully complied with the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations issued by former Attorney General Dick Thornburgh under the authority provided in 28 U.S.C. §§ 509, 510 and 533. Rich Decl., Ex. F. Contrary to defendants' assertions, NAP claims that the investigation, itself, is sufficient to constitute standing. However, its reliance on *Lowenstein v. Rooney*, 401 F.Supp. 952 (E.D.1975), is misplaced. In *Rooney*, the FBI engaged in an illegal conspiracy with a member of Congress to investigate the plaintiff and "give information in bad faith to aid in [the Congressman's political] campaign." *Id.* at 958. In deciding whether Lowenstein's claims met the *Laird* standard, the Court found the claims sufficient largely because the FBI's actions placed the "investigation of one man ... at issue, with an alleged specific objective in mind and a specific means to accomplish that objective." *Id.* at 959.

For similar reasons, this case can be distinguished from *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980). In *Quinn*, plaintiff was a former city government employee who was discharged because of allegations raised by government officials that he had stolen city funds. After bringing an action against the city for damages and reinstatement under § 1983 of the Civil Rights Act (42 U.S.C. § 1983), the District Court converted defendant's motion to dismiss to a motion for summary judgment and dismissed the complaint. *Id.* at 444. The Court of Appeals reversed the District Court's decision, finding that plaintiff had alleged the following facts to support his claim: 1) evidence that city officials had engineered a purposeful campaign to thrust upon

plaintiff the responsibility for the missing funds; 2) statements made by various city officials suggesting that he was discharged for failing to cooperate in the criminal investigation; and 3) evidence that plaintiff's discharge resulted directly from the allegations. *Id.* at 445. In other words, plaintiff alleged that he suffered an enormous injury—the loss of his employment—which directly resulted from the actions of the city officials.

Unlike the Lowenstein investigation, the facts do not suggest that the FBI investigated one person, had a specific objective, or had a specific means to accomplish that objective. Nor can plaintiffs point to a concrete injury similar to that sustained by the plaintiff in *Quinn.* Instead, plaintiffs rely solely on hypothetical speculation about how the information gathered by the FBI might be used against the party in the future. As the Supreme Court held in *Lujan,* such conjecture cannot provide the foundation for federal jurisdiction. —— U.S. at ——, 112 S.Ct. at 2133.

 Additionally, NAP has not persuasively argued that the FBI's 1988 investigation interfered with its political competitiveness. In its memorandum opposing defendants' motion to dismiss, NAP claims that "'tilting the electoral playing field' includes FBI support for partisan conduct by private actors in the electoral process." Pl.'s Memo. at 15. Under the doctrine of competitive advocate standing, parties have standing to assert federal claims even if they have not been directly injured, provided they can prove that another group has received a competitive advantage as a result of the alleged activity. *In re U.S. Catholic Conference,* 885 F.2d 1020, 1029 (2d Cir.1989), *cert. denied,* 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990). As the Supreme Court recently held in *Florida General Contractors v. Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586, 597 (1993):

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. (emphasis supplied).

In *Florida General Contractors,* plaintiffs sought to overturn a Jacksonville city ordinance that required ten percent of city construction funds to be set aside for female and minority contractors. Similarly, the cases relied on by the Supreme Court in reaching its decision involved some government ordinance or organizational policy that appeared to distinguish between various citizens or groups.[1] Unlike the plaintiffs in *Florida General Contractors* or its predecessors, there is no evidence that the FBI investigation created a barrier to NAP's presence in the electoral arena or impeded its political activities. Further, there is no provision in the Attorney General Guidelines that subject certain organizations to investigation. To the contrary, the Guidelines authorize the FBI to investigate any individual or organization suspected of *criminal* activity, regardless of whether it supports the ideology of the Republican Party, the Democratic Party or an independent political party such as NAP. Under the authorization of those guidelines, the FBI initiated a preliminary inquiry of NAP which was ended when the information could not be corroborated. American history is replete with examples of government investigations of political candidates, political parties and public officials at all levels of local, state and federal government. The New Alliance Party has failed to distinguish its investigation from that of any other national political party suspected of

1. *See Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (Georgia law limiting school-board membership to property owners challenged on equal protection grounds); *Quinn v. Millsap,* 491 U.S. 95, 109 S.Ct. 2324, 105 L.Ed.2d 74 (1989) (same); *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) ("automatic resignation provision" of Texas Constitution violated equal protection of state officeholders considering candidacy for other offices); *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (applicant challenging medical school's admissions program).

*criminal* activity. Thus, even if this case proceeded to trial, plaintiffs would have extreme difficulty establishing the requisite injury necessary to sustain a jury verdict.

## B. *No Nexus Between Plaintiffs' Alleged Injury And Defendants' Activities*

 Even if this court found that NAP suffered a cognizable injury, it could not be directly traced to the 1988 FBI investigation. Based on the information contained in the complaint, any stigmatization which NAP suffers could be traced to a myriad of statements and publications made by private individuals and organizations, many of which preceded the FBI investigation.

In its complaint, NAP admitted that although the FBI has investigated Dr. Newman's activities, "opponents ... have attempted to delegitimize his positions, preempt objective and scientific debate about his ideas and activities, and intimidate persons from considering his views or associating with him or organizations with which he is affiliated, by describing such organizations as 'cults,' labeling Dr. Newman a 'cult leader,' and calling persons associated with him 'Newmanites.'" Comp. ¶ 11. This language strongly suggests that Dr. Newman's views have long been subjected to public criticism, a fate not uncommon among public figures.

NAP also accuses the FBI of supporting the attacks made against it by other organizations by accumulating publications written by private organizations such as the Anti-Defamation League of B'nai B'rith (ADL), the Political Research Associates (PRA) and several newspapers, including the *Village Voice*, the *Boston Phoenix* and the *New York Post*. Comp. ¶¶ 29–36. In short, NAP claims that "for 'several' years," these private organizations "have published articles explicitly or implicitly applying the 'cult' label to plaintiffs," and the FBI has given "credibility to the 'private findings' by incorporating the reports into files that are obtained through the Freedom of Information Act (FOIA) by journalists and others." Comp. ¶¶ 35–36 (emphasis supplied).

It is no secret that a major source of any investigative fieldwork consists of obtaining articles and publications on the subject of the investigation. Virtually all of the "private" findings that NAP has complained of constitute "public" information that is available to any American citizen. Just like the information reviewed by the *Laird* Court, this information is "nothing more than [information that] a good newspaper reporter would be able to gather by attendance at public meetings and ... clipping ... articles from publications available on any newsstand." 408 U.S. at 8, 92 S.Ct. at 2323, 33 L.Ed.2d at 161. Accordingly, plaintiffs have failed to persuasively trace their "alleged injuries" directly to defendants in this action.

## C. *Relief Sought Does Not Redress A Specific Injury*

As stated previously, plaintiffs seek a declaratory judgment that "defendants' description of a group of persons as a 'cult,' or its use of such a description as the predicate or justification for investigative activities, use of force, criminal prosecution or government regulation is a violation of the First, Fourth and Fifth Amendments of the Constitution of the United States." Comp. ¶ 1. Again, plaintiffs have failed to establish the third element comprising constitutional standing not only because the relief requested fails to redress their alleged injuries but because it goes far beyond virtually all of the allegations raised in the complaint.

 Before a court can find a justiciable controversy, "the plaintiff who seeks to invoke the judicial power [must] stand to profit in some personal interest." *Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 38, 96 S.Ct. at 1924, 48 L.Ed.2d at 461. It is not enough that the requested relief merely addresses some perceived wrong to society. *Laird,* 408 U.S. at 11, 92 S.Ct. at 2324–25, 33 L.Ed.2d at 163–64. Instead, there must be "a likelihood that the injury will be redressed by a favorable decision" and that the prospect of obtaining relief from the favorable ruling will not be too speculative. *Florida General Contractors,* —— U.S. at ——, 113 S.Ct. at 2302, 124 L.Ed.2d at 596.

 Here, NAP's requested relief, a declaratory judgment prohibiting the FBI from using a "cult" characterization as a pretext

for investigating a group, goes beyond plaintiffs' alleged injury and seeks a general "bright-line" rule which would be applicable in all future situations, those involving political parties as well as those involving other groups. In light of the pleadings, this relief is entirely inappropriate. Plaintiffs have produced no evidence to support their allegations that defendants used the "cult" characterization as a pretext for investigating NAP's activities. Nor have they alleged that defendants "use[d] force, criminal prosecution or government regulation" to deter any of NAP's activities. Accordingly, the requested relief fails to address plaintiffs' alleged injury.

For these reasons, the court finds that plaintiffs lack standing to bring this cause of action and, therefore, the court has no jurisdiction over this matter. *In Re U.S. Catholic Conference,* 885 F.2d at 1023. Defendants' motion is granted and the complaint is dismissed.

### SOVEREIGN IMMUNITY

Additionally, defendants urge this court to dismiss plaintiffs' complaint because: (1) plaintiffs have failed to identify "any applicable waiver of sovereign immunity;" and (2) plaintiffs have erroneously based jurisdiction on the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Since the court has already granted defendants' motion, it is unnecessary to address any remaining issues. However, it should be noted for the record that both allegations have no merit and should be rejected.

Generally, the United States and federal agencies are immune from suit unless Congress waives such immunity. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607, 613 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114, 121 (1976). Since the FBI is a federal agency, defendants seek to avoid plaintiffs' claims by asserting sovereign immunity. However, 5 U.S.C. § 702 provides in part:

An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed

to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. (emphasis added).

While the doctrine of sovereign immunity bars lawsuits against government agencies or officials for money damages, it does not bar suits for injunctive or declaratory relief. *See Ghandi v. Police Dept. of City of Detroit,* 747 F.2d 338, 343 (6th Cir.1984) (Congress amended § 702 in 1976 to allow actions seeking non-monetary relief against government agencies if the agency conduct is otherwise subject to review); *Jaffe v. United States,* 592 F.2d 712, 718 (3rd Cir.1979) (legislative history of § 702 specifically waives sovereign immunity in equitable actions brought under § 1331).

Here, NAP seeks equitable relief under the Declaratory Judgment Act; it seeks no monetary damages. Further, the complaint clearly states that the action arises under the First, Fourth and Fifth Amendments, *but* jurisdiction is "founded on 28 U.S.C. §§ 1331 and 1343." Comp. ¶ 7. Since plaintiffs have pleaded constitutional claims, defendants' motion on this ground is denied.

### CONCLUSION

For the reasons stated above, defendants' motion is granted.