John V. ESPOSITO, Plaintiff,

v.

**METRO–NORTH COMMUTER RAILROAD COMPANY,**
Defendant.

No. 92 Civ. 5237 (LAP).

United States District Court,
S.D. New York.

June 30, 1994.

Peter L. Maroulis, Poughkeepsie, NY, for plaintiff.

Patterson, Belknap, Webb & Tyler, Philip R. Forlenza, New York City, for defendant.

## OPINION & ORDER

PRESKA, District Judge:

Plaintiff brings this action under 42 U.S.C. § 1983 alleging that he was deprived of a liberty interest without due process in the course of the termination of his employment

---

1. Because this is defendant's motion for summary judgment, the facts below are related in the

with defendant. Presently before me is defendant's motion for summary judgment.

### Background [1]

The complaint in this action alleges violations of plaintiff's civil rights stemming from his termination as Chief of Police of defendant Metro–North Commuter Railroad Co. ("Metro–North") on August 5, 1988. The stated reason for the termination was plaintiff's failure to notify his supervisor, Don Nelson, or the President of Metro North, Peter Stangl, of the existence of a videotape involving Metro–North police officers. The videotape, entitled "Bubba on Patrol," shows seven white, on-duty Metro–North police officers patrolling in Grand Central Station in 1983. One of the officers is shown pretending to make his rounds while nude except for his hat, gunbelt, tie, and boots. Other officers are shown directing racial slurs at a "homeless" black person in the station.

Plaintiff first learned of "Bubba on Patrol" in 1985 from Metro–North Police Captain Dean Evans, who had known about it since 1983. Upon viewing the tape, plaintiff immediately sought to discipline the officers involved but was told by Joseph Meloney, Metro–North's Assistant Manager of Labor Relations, the no action could be taken. Under the collective bargaining agreement, Meloney said, disciplinary action against Metro–North employees had to be commenced within 30 days of discovery of the offending conduct by a management official. Because Captain Evans, a management official, had known of the videotape for over two years, the "statute of limitations" on the videotape, so to speak, had run out. After speaking with Meloney, plaintiff informed Don Nelson, his supervisor, of the existence of "Bubba on Patrol" and of his belief, divined from Meloney, that nothing could be done to punish those involved. Nelson did not ask to see the tape and accepted that the situation was beyond redress.

On July 13, 1988, plaintiff was indicted by a New York State grand jury and charged in 32 counts with various abuses of the New

manner most favorable to the plaintiff.

York State Police Information Network, a computer data base for official use by police organizations. Following the indictment, Metro–North was supportive of plaintiff. Although he was suspended, the suspension was with pay, and Metro–North paid for plaintiff's legal representation. Peter Stangl, then President of Metro–North, issued a statement expressing his belief that plaintiff's "actions were done in the conduct of Metro–North's business and did not involve any personal gain." The indictment and Metro–North's reaction to it received substantial press coverage.[2]

On July 28, 1988, while home on suspension from work, plaintiff was contacted by a reporter for a New York City television station who inquired whether plaintiff knew anything about the videotape entitled "Bubba on Patrol." Plaintiff, in response, showed the videotape to the reporter, allowed him to copy it, and consented to its being aired on the local news. His motivation for doing all this was to "get back at ... the people responsible for" his arrest.

Within hours of releasing the videotape, plaintiff called Don Nelson to tell him that a television reporter had gotten a copy of "Bubba on Patrol" and would soon broadcast it on television. Plaintiff chose not to tell Nelson that he had been the one who had given the tape to the reporter and, in fact, willfully concealed this piece of information from everyone, including Metro–North investigators and the New York City Inspector General, until his deposition in this action on January 18, 1993.

On August 1, 1988, Nelson informed President Stangl of the videotape, and Stangl commissioned an internal investigation of all aspects of the situation. The investigator's report corroborated much of plaintiff's story with respect to the videotape, including the date he first became aware of it and his sincere belief that the Collective Bargaining Agreement barred the imposition of any discipline. The report contradicted plaintiff, however, in his assertion that he had informed Nelson of the videotape within days

of learning of it himself in 1985. The investigator, supported by Nelson, concluded that plaintiff's July 1988 warning to Nelson that the videotape was soon to be broadcast had been Nelson's first indication of the videotape's existence. Based on the report, and on Nelson's confirmation, Stangl concluded that plaintiff had not reported "Bubba on Patrol" to Nelson in 1985. Stangl further concluded that plaintiff's failure to inform his superior immediately of the existence of the inflammatory and offensive videotape was conduct warranting dismissal.

On August 3, 1988, "Bubba on Patrol" was broadcast on local New York television, generating a firestorm of controversy and outrage. Plaintiff and representatives of Metro–North commented to the press that plaintiff had sought to discipline the officers involved but had been blocked by the Collective Bargaining Agreement. Two days later, Stangl telephoned plaintiff and informed him that his employment was terminated because of his failure to notify his superior immediately of the existence of the videotape. Plaintiff protested the he had immediately informed Nelson of the videotape; he did not, however, request a hearing on the issue. Also on August 5, Metro–North issued a press release announcing plaintiff's termination and explaining that plaintiff had "made an inexcusable error in judgment" by not telling either his supervisor o[r] Stangl about "Bubba on Patrol."

During the first two years following his dismissal, plaintiff spent most of his time battling the unrelated criminal indictment against him and did not look for other employment. Upon the conclusion of the criminal case, plaintiff sought employment with Conrail in Philadelphia but was told no positions were available. He did not pursue local police jobs after being told that all such jobs in New York State required civil service status, which he did not have. Nor did he seek police-type employment anywhere outside New York State. In 1993, after the instigation of this litigation, plaintiff sought

---

**2.** Ultimately, most of the charges against plaintiff were dismissed before trial, and he was acquitted of the remainder by a jury.

reinstatement in his position with Metro–North, but his application was ignored.

## Discussion

### I. Standard for Summary Judgment

Rule 56(c) provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Richardson v. Selsky,* 5 F.3d 616, 620 (2d Cir.1993). The substantive law identifies the facts which are material. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the nonmoving party to " 'set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538. However, the nonmoving party is entitled to have all inferences and ambiguities resolved in its favor. *Gladstone v. Fireman's Fund Ins. Co.,* 536 F.2d 1403, 1406 (2d Cir.1976). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992).

### II. Plaintiff's § 1983 Due Process Claim

■ To prevail on a due process claim, a plaintiff must establish that a government agent or entity has (1) deprived him of an interest protected under the Fifth Amendment (made applicable to the states through the Fourteenth Amendment) and (2) effected the deprivation without the process that was constitutionally due. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *U.S. v. Phelps,* 955 F.2d 1258, 1266 (9th Cir.1992). In this case, plaintiff contends that Metro–North unconstitutionally deprived him of a protected liberty interest by the manner in which it terminated his employment. Specifically, plaintiff contends that Metro–North's press release announcing his termination—in which it was stated that plaintiff had made an inexcusable error in judgment by failing to report the offensive videotape—stigmatized him and thereby deprived him of his liberty to take advantage of other employment opportunities.[3] Moreover, plaintiff alleges, because Metro–North did not offer him a hearing to refute the charges supporting his termination, Metro–North deprived him of his liberty interest without the process that was due. I will examine each of these contentions in turn.

### A. Was there a Deprivation?

■ It is now beyond question that terminated state employees have a constitutionally-protected liberty interest in "avoiding 'a stigma or other disability' that forecloses other employment opportunities." *Baden v. Koch,* 799 F.2d 825, 829 (2d Cir.1986) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972)). *See also O'Neill v. City of Auburn,* 23 F.3d 685 (2d Cir.1994); *Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 177 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 244 (1991). To establish a deprivation of this interest, a plaintiff must prove that in connection with his or her termi-

---

**3.** Although not claimed by plaintiff, his termination may also have implicated his liberty interest in his good name and reputation for integrity. *See Baden v. Koch,* 799 F.2d 825, 829 (2d Cir. 1986). This is a weaker liberty interest than avoiding stigma which forecloses employment, *id.,* so my conclusion below that plaintiff received the process due with respect to any deprivation of the latter interest renders consideration of the former interest unnecessary.

nation, the state employer published stigmatizing information which is, at least arguably, false.[4] *O'Neill,* 23 F.3d at 693; *Kelly Kare,* 930 F.2d at 177; *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 446 (2d Cir.1980). The plaintiff must also prove that because of the stigma imposed by the defendant, he or she has been foreclosed from a range of other employment opportunities. *Id.*

Insofar as the statement here that is alleged to have stigmatized plaintiff was contained in a press release admittedly issued by defendant, there is no dispute that the element of publication is satisfied. Additionally, because Metro–North concedes that there is an open issue of fact as to the truth or falsity of the statement contained in the press release, the element of arguable falsity is satisfied as well. Defendant's primary arguments for summary judgment on the issue of whether any deprivation occurred are that (1) its statement did not stigmatize plaintiff, and (2) that plaintiff has failed come forth with any evidence to show that he was foreclosed from other employment.

### 1. Was Plaintiff Stigmatized?

■ Very soon after the Supreme Court's *Roth* opinion made clear that terminated state employees had a protected liberty interest in avoiding the imposition of unjustified stigma, the Court of Appeals announced its view that not every statement by an employer tending to reflect negatively on a terminated employee constituted a constitutional offense. *See Russell v. Hodges,* 470 F.2d 212, 217 (2d Cir.1972) (Friendly, J.). Generally, courts of this circuit have required a plaintiff to "show that he was dismissed amid allegations of dishonest, illegal, or immoral conduct in order to be stigmatized enough to be unconstitutionally deprived of liberty." *Brito v. Diamond,* 796 F.Supp. 754 (S.D.N.Y. 1992), *aff'd,* 990 F.2d 1250 (2d Cir.1993). More recently, the Court of Appeals held that allegations striking at the " 'very heart of [the employee's] professional competence,' " so as to "significantly impede his

ability to 'practice his profession' " are also sufficient to ground a due process claim. *O'Neill,* 23 F.3d at 691. "Ordinary" allegations of incompetence, however, do not rise to the necessary level. *Id.*

On its face, defendant's statement about plaintiff—that he had made an inexcusable error in judgment in failing to report the videotape to his superiors immediately—contains no accusations of dishonesty, illegality, or immorality. Plaintiff himself concedes as much. The only constitutionally-sensitive area the statement arguably approaches is plaintiff's professional competence. It does not encroach on that area, however, because it cannot fairly be read as a pervasive indictment of plaintiff's ability to do his job. *See Id.* It merely asserted that in one instance, he made an error in judgment, albeit a very serious one, and made no assessment of his overall competence. Thus, standing alone, defendant's statement is not sufficiently stigmatizing to ground a constitutional claim.

■ Plaintiff urges the Court to look beyond the statement itself and consider the context in which it was released. At the time the press release was issued, plaintiff points out, "Bubba on Patrol" had been aired on television, and its offensive and racist content had been widely reported. In view of that fact, plaintiff says, defendant's statement that he had failed to report the tape to his superiors was likely to have led those who heard it to infer that plaintiff had condoned what plaintiff describes as the videotape's "highly immoral and racially discriminatory" content or at least did not consider it serious enough to merit further action. Such an inference, he maintains, undermined both his character and his professional competence. Additionally, plaintiff argues, because the statement was released while he was widely known to be under indictment, his reputation and character were particularly vulnerable to attack.

Metro–North argues that it was not responsible for creating the context and cannot

---

**4.** The plaintiff is not required to prove that the information is definitely false, "that being the function of the eventual name-clearing hearing" he or she seeks in the due process action.

*O'Neill,* 23 F.3d at 693. *See also, Brandt v. Board of Coop. Educational Services,* 820 F.2d 41, 43 (2d Cir.1987).

be held liable for whatever effect the context may have had and that, in any event, the statement cannot be found to be stigmatizing under *O'Neill* and *Baden.*

Undisputed evidence supports Metro–North's claim that it had no role in creating the supposedly harmful context. Defendant's contemporaneous public statements supported plaintiff's assertions that he had believed the participants in the videotape to be beyond discipline and that he had acted in what he thought to be the best interests of Metro–North. Defendant also remained publicly steadfast in its position that defendant was not guilty of wrongdoing in connection with the criminal indictment against him. Moreover, it is plaintiff who must bear primary responsibility for the context in which the statement was released because of his vindictive decision to release "Bubba on Patrol" to the news media.

From all angles, defendant's claim that it did not create the "stigmatizing context" appears sound. That fact, however, does not insulate defendant from liability. Defendant contends in its papers that liability for post-termination statements may only attach where stigma is intrinsic in such statements themselves, without reference to external circumstances. No case in this Circuit, however, requires or supports such a restrictive reading of the claim for relief. *O'Neill, Kelly Kare, Brandt, Baden* and *Quinn,* all cited *supra,* as well as *Greene v. McGuire,* 683 F.2d 32 (2d Cir.1982) and *Gentile v. Wallen,* 562 F.2d 193 (2d Cir.1977), all state only that the information disseminated by the employer must be stigmatizing. None of them require that the determination of whether the information is stigmatizing be done in a vacuum.

The authorities cited by defendants in support of their position, in fact, do not support it. They merely establish that a defendant must take some affirmative, wrongful action in connection with the release of information to be held liable on this type of claim. Thus, where a defendant terminates an employee but makes no public statements, *e.g., Greene, supra; Covert v. Redevelopment Auth.,* 447 F.Supp. 270 (M.D.Pa.1978), or where a defendant terminates an employee and makes only truthful public statements, *e.g., Hannon v. Turnage,* 892 F.2d 653 (7th Cir.), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990), courts have found that no stigma-based due process claim may be stated. By contrast, in this case, defendant is alleged to have acted wrongfully by disseminating false information about plaintiff. Assuming that to be true (as I must for summary judgment purposes), defendant may fairly be held liable for any stigmatizing effect a jury might find attributable its false statement, either directly or indirectly.[5]

Having found that defendant cannot divorce itself from the context in which its statement was released, I also find that it is that very context which avoids any stigmatizing effect here. Plaintiff argues that Metro–North's statement could be interpreted as implying that plaintiff condoned the racially offensive behavior on the tape and that such an accusation attacked his character and his competence to do his job within the meaning of *O'Neill.* Here, however, Metro–North's accompanying statements and the plaintiff's own widely-reported contemporaneous statements negated the possibility of any such supposedly stigmatizing inference being drawn. As noted above, at the same time it released the allegedly offending statement, Metro–North accurately reported plaintiff's position that he had not reported the existence of the tape because of his belief that the perpetrators were not punishable under the collective bargaining agreement's thirty day rule. Plaintiff's own statements to that effect were also widely reported in the press at the same time. Thus, when the context of Metro–North's statement is considered, it cannot be said to be capable of stigmatizing plaintiff within the meaning of *O'Neill.* I find, therefore, that plaintiff has failed to raise an issue of fact as to whether he was

---

5. It is particularly fair in this case insofar as defendant issued its statement with full knowledge of the potentially stigmatizing context. There is no dispute that defendant knew that "Bubba on Patrol" had been broadcast at the time it publicly stated that defendant had failed to report the videotape to his superiors.

stigmatized by defendant. Summary judgment may be granted on that basis.

### 2. Was Plaintiff Foreclosed from Employment?

Plaintiff maintains that he is entitled to have a jury decide if stigmatizing statements made by Metro–North foreclosed him from other employment opportunities. This is true, of course, only if plaintiff has come forward with evidence sufficient to raise an issue of fact on this question. Plaintiff has not carried this burden.

■ As an initial observation, I note that plaintiff's showing must be that "a governmentally imposed stigma restrict[ed] his ability to seek and obtain employment." *Quinn,* 613 F.2d at 446. Therefore, to recover on his due process claim, plaintiff must demonstrate not only that he has had difficulty finding employment but also that such difficulty was due to the stigma allegedly placed upon him by Metro–North. *See Conaway v. Smith,* 853 F.2d 789, 795 (10th Cir.1988); *Nauta v. City of Poughkeepsie, N.Y.,* 610 F.Supp. 980, 985 n. 24 (S.D.N.Y.1985).

■ The undisputed evidence shows that since his termination, plaintiff has made only minimal efforts to find employment. During the first two years following his termination, plaintiff made no inquiries of prospective employers because he was preoccupied with defending himself against the criminal charges against him. Even if he had made such inquiries, plaintiff concedes that the indictment made him virtually unemployable as a police officer during its pendency.

Following his acquittal, defendant contacted the Ulster County civil service commission to explore the prospect of employment as a police chief in one of the several police departments in the County. He was told that he was not eligible for any of these positions because he lacked the requisite civil service status. The civil service requirements were applicable state wide, plaintiff was told. He therefore concluded that he would be unable to secure employment in any municipal police department and made no further efforts in that regard.

In 1991 or 1992, plaintiff alleges, he contacted Joseph O'Neill, an acquaintance at ConRail in Philadelphia, to ask about possible employment there. O'Neill told plaintiff that although he would probably hire plaintiff if a vacancy existed, there were no vacancies at ConRail, so he could not offer plaintiff a job. In his deposition, plaintiff, citing unnamed sources, voiced his suspicion that there was in fact an opening at ConRail and that someone else had been hired. Despite being given an opportunity to supplement the record, however, plaintiff was unable to name anyone who had told him of an opening at ConRail. The record thus contains no evidence cognizable under Rule 56, that is, no evidence beyond plaintiff's vague assertion not on personal knowledge, that the situation at ConRail was anything other than what was described by O'Neill. Such assertions are not sufficient to defeat summary judgment.

■ The attempts described above constitute the sum of plaintiff's pre-litigation efforts to secure employment after his termination by Metro–North.[6] Plaintiff maintains that he did not look further because Stangl, having been promoted to President of the Metropolitan Transit Authority, controlled all of the jobs connected to commuter railroad systems in the New York City area and his lack of civil service status barred him from all jobs with municipal police departments. Apparently, plaintiff felt himself limited to those two fields and never explored the possibility of employment in the private sector.

The record demonstrates that plaintiff has failed to carry his burden of establishing a genuine issue of material fact as to whether he has been foreclosed from employment opportunities by a stigma imposed by defendant. The undisputed evidence indicates that plaintiff has been unable to secure a job with a municipal police department not because of any stigma but because he lacks civil

---

6. During the pendency of this litigation, plaintiff applied to Metro–North for employment. Interpreting the application as a litigation ploy, Metro–North ignored it. Because plaintiff had no property interest in his Metro–North job, the company's refusal to rehire him cannot be the basis for his claim.

service status.[7] Similarly, the only cognizable evidence in the record reflects that Con-Rail's refusal to hire plaintiff was due to its lack of job openings rather than any negative opinion of plaintiff. Plaintiff argues that he was foreclosed from employment with all other commuter railroads, but he did not seek such employment and thus cannot possibly show that he was kept therefrom by any stigma. The same problem results from plaintiff's failure to seek security/police related employment in the private sector; because he did not seek such employment, he cannot show that it was denied him because of any action of defendant. Plaintiff maintains that he was not qualified for any job other than municipal or railroad police chief, but even were that true, it would not help him establish that he was foreclosed from employment by an alleged stigma. Quite the opposite, it would show that his difficulty in securing employment resulted not from any stigma but from the fact that there were no jobs available to him in his chosen field.

Overall, the evidence does not present a genuine issue of material fact as to whether plaintiff was foreclosed from employment by any stigma imposed by defendant. Plaintiff, therefore, fails to establish a constitutionally cognizable deprivation, and summary judgment may be granted on this ground.

### B. Did Plaintiff Receive the Process that was Due?

█ As noted above, to state a due process claim, a plaintiff must not only show that he has suffered a deprivation of a constitutionally protected interest but also that the deprivation was effected without the process that was due. The question of whether an individual received the process that was due must be answered by balancing several factors. A court "must weigh the strength of the individual's interest, the risk of erroneous deprivation, the probable value, if any, of requested additional procedures and the state's interest in providing (or not providing) those procedures." *Baden,* 799 F.2d at 831 (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18

(1976)). In cases such as this, where a government employee asserts that he has been stigmatized in the course of a decision to terminate his employment, the Supreme Court has held that the process due is that which provides the terminated employee with a meaningful opportunity to clear his name. *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977). *See also Buxton v. City of Plant City, Fla.,* 871 F.2d 1037, 1046 (11th Cir.1989).

█ Plaintiff here contends that he was deprived of due process by defendant's refusal to grant him a formal, pretermination hearing on the issue of when he had informed Nelson of the videotape. This contention is unavailing for a number of reasons. First of all, at most, plaintiff was entitled to a *post*-termination hearing. As the Eleventh Circuit has stated, "Because [a hearing] is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests." *Campbell v. Pierce County, Georgia,* 741 F.2d 1342, 1345 (1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). *See also Baden,* 799 F.2d at 830 ("In order to succeed on his liberty interest claim, Baden must also prove that Koch improperly refused to grant him a *post-removal opportunity* to refute the false charges that led to his removal") (emphasis added).

█ Secondly, a formal hearing, either pre-termination or post-termination, would not have afforded plaintiff any means beyond those already available to him to defend his reputation. This is so for two reasons. First, as plaintiff concedes, because media interest in his story was so intense, he had, and took advantage of, ready and pervasive access to the public to refute the allegations against him. Indeed, as the plethora of newspaper articles contained in the record demonstrates, plaintiff was not shy about publishing his version of events, and the media was more than willing to report it. In that respect, this case is strikingly similar to *Baden,* where the Court of Appeals observed

---

**7.** Plaintiff acknowledges that his lack of civil service status is due to his past employment

history and not any action on the part of defendant.

that "[w]ith his high degree of access to the news media, Baden did not need a formal hearing as a forum in which to repeat his side of the story." 799 F.2d at 832. Also as in *Baden*, it was not only plaintiff who was telling plaintiff's story but defendant as well. *Baden*, 799 F.2d at 832. In media reports of plaintiff's firing, defendant confirmed that the Collective Bargaining Agreement imposed a thirty-day rule on disciplinary action. This further illustrates the *de minimis* utility of a name-clearing hearing. *Id.*

The second reason a hearing would have been of no value to plaintiff is that had any hearing been held, plaintiff would have had to admit that he had released "Bubba on Patrol" to the news media to pursue a personal vendetta and that he had willfully concealed this fact from Metro–North officials and the public. Thus, assuming a hearing would have cleared plaintiff of any inference that he condoned the activities shown in "Bubba on Patrol," it would simultaneously have revealed him to be a vindictive liar—hardly an improvement over the no-hearing situation.

Because I find that plaintiff had ample ability to refute the charges against him and that the additional procedures he seeks would have afforded him at best a theoretical to no advantage over the procedures he received, I conclude that plaintiff was granted all the process that was constitutionally required. Summary judgment may also be granted on this ground.[8]

### Conclusion

Defendant's motion for summary judgment is granted.

---

8. As an additional basis for summary judgment, defendant asserts that its statement was constitutionally protected under the First Amendment as speech about a public figure on a matter of public concern. *See New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Consideration of this argument would require me to perform a constitutional analysis to resolve the conflict between plaintiff's Four-teenth Amendment rights and defendant's First Amendment rights. Because sound judicial principles counsel against stepping into such minefields unless absolutely necessary, and because I have concluded that there are two other independent bases for granting summary judgment, I decline defendant's invitation to consider this particular constitutional question.