**Raymond E. HAGEMANN, Plaintiff,**

v.

**Guy MOLINARI, the City of New York and Lee Covino, Defendants.**

**No. 95 CV 3618.**

United States District Court,
E.D. New York.

Aug. 6, 1998.

Andrew Celli, Emery & Celli, New York City, for Plaintiff.

Paul Crotty, Corporation Counsel of the City of New York, New York City (Julie O'Neill, of counsel), for Defendants.

## OPINION & ORDER

GERSHON, District Judge.

This case centers around a note that plaintiff Raymond Hagemann sent on July 15, 1994, to two of his co-workers, Lee Covino and Marilyn Blohm, accusing them of racial insensitivity while all three were working for Staten Island Borough President Guy Molinari. Molinari read a copy of the note and allegedly fired Hagemann because of it.

Plaintiff filed this action under 42 U.S.C. §§ 1981, 1983, and 1985(3) against Molinari, Covino, Blohm [1] and the City of New York in 1995, claiming that they violated his rights under the First and Fourteenth Amendments to the United States Constitution. Plaintiff also asserts state law defamation and whistleblower claims under the doctrine of supplemental jurisdiction. Defendants have moved for summary judgment on all claims. Plaintiff claims there are issues of fact requiring a trial.

## FACTS

Unless otherwise indicated, the following facts are undisputed or reflect evidence submitted by plaintiff which, at least for purposes of this motion, defendants do not dispute. Plaintiff Raymond Hagemann ("Hagemann") was employed as Project Planner to defendant Staten Island Borough President Guy Molinari ("Molinari") from 1990 to 1994. Hagemann's primary role was to assist Molinari in investigating matters of concern to the Staten Island Community. Defendant Lee Covino ("Covino") was Molinari's Director of Contract Oversight. Marilyn Blohm ("Blohm"), who joined Molinari's staff in 1990, became Chief of Staff in late 1991.

In July 1993, Hagemann began serving as Molinari's liaison to the Rising Stars, an interracial youth basketball program run by Ed Watkins, an African–American. Molinari's office (the "Office") provided funding on a yearly basis to the Rising Stars from 1993 through 1995. Because the Rising Stars was not incorporated, funding was provided via contract between the Office and certain not-for-profit organizations acting as conduits for the funds.

As liaison to the Rising Stars, Hagemann had many conversations with Watkins in 1993 and 1994. Hagemann states that Watkins reported to him on "numerous occasions" that Covino and Blohm were unwilling to meet with him or to return his telephone messages, that they appeared irritated and impatient with him, and that they neglected to provide him with any substantial assistance in completing funding applications.

Hagemann also states that Covino was unhelpful when Hagemann requested assistance with matters relating to the Rising Stars, once referring to Watkins as a "dinge," and that Blohm disparaged Watkins personally in meetings with Molinari, exclaiming "Oh no, not him!" when Watkins was suggested for service on an advisory committee. Also, according to Hagemann, in July 1993, Blohm and Covino blamed Watkins for a critical editorial in the New York *Daily News,* and Blohm told Hagemann, "I don't care if he [Watkins] is black, he has to conform to our rules." On another occasion, Blohm told Molinari's receptionist that she did not want "the big black guy" (Watkins) in the reception area when Molinari was receiving visitors.

Finally, on July 13, 1994, Watkins reported that he had been "ejected" from Borough Hall at Blohm's direction and that he believed his "ejection" was racially motivated. According to Hagemann, Watkins advised him that he had a scheduled appointment with Covino; that Covino was not there when Watkins arrived; that Blohm kept Watkins waiting for ten minutes when he asked to see her; and that, ultimately, Blohm instructed her receptionist to have Watkins escorted out. (Defendants do not respond as to whether Watkins had a scheduled appointment with Covino or whether Blohm kept Watkins waiting, but they acknowledge that neither Covino nor Blohm met with Watkins that afternoon.)

On July 15, 1994, after talking with Watkins, Hagemann sent Blohm and Covino handwritten notes accusing each of them of "exhibiting unprofessional, racially insensitive attitudes" toward Watkins on several occasions in their "official capacities" as Molinari's employees; demanding that they apologize in order to "preserv[e] good relations with the black community"; and stating that, in the absence of an apology, he would file a formal complaint with the Commission on Human Rights. Hagemann forwarded copies of the notes to Molinari.

It is undisputed that, upon reading the notes, Molinari told several people that, if

---

1. Plaintiff has dismissed with prejudice all claims against Blohm.

Hagemann's allegations proved true, he would fire Blohm and Covino and that, if the allegations proved false, he would fire Hagemann. Molinari asked John O'Hara, a consultant, and Daniel Master, counsel to the Office, to investigate Hagemann's allegations. O'Hara states that Molinari told him that he did not believe Covino and Blohm were racially insensitive or that Hagemann could prove his charges. O'Hara also states that he warned Molinari that it would be "wrongful termination" to fire Hagemann for expressing an opinion.

On the weekend of July 16–17, 1994, Hagemann went to Borough Hall and took certain documents from Covino's office. Covino contends he never gave Hagemann permission to take the documents. Hagemann claims that he was indirectly authorized to gather the documents because Molinari put no limits on the Investigation Unit's methods for pursuing information.

On July 18, 1994, Hagemann wrote Molinari a letter, describing the events of July 13, 1994, offering to apologize to Blohm and Covino if his understanding proved incorrect, and proposing a meeting between himself, Blohm, Covino and Watkins as a means of achieving an amicable resolution. Molinari did not respond to Hagemann's letter. On July 25, 1994, Hagemann gave O'Hara a detailed memorandum setting forth his allegations against Covino and Blohm.

O'Hara and Masters conducted interviews throughout July and August. On August 15, 1994, prior to interviewing Watkins, Masters wrote Molinari a status report stating that, thus far, the allegations of racial insensitivity had been unsubstantiated. According to O'Hara, Molinari responded by stating that it would be a waste of time to interview Watkins. O'Hara and Masters interviewed Watkins nonetheless on August 25, 1994.

It is undisputed that Molinari met separately with Covino and Blohm, prior to the completion of the investigation, to inform them that Hagemann's charges had not been substantiated. Hagemann alleges that Covino and Molinari conspired to terminate him. Covino admits asking Molinari to discipline Hagemann and to place a report regarding the investigation in Hagemann's file. However, neither Covino nor Blohm acknowledge asking Molinari to fire Hagemann. In fact, Blohm states that she told Molinari she believed Hagemann had acted in good faith.

Masters and O'Hara issued separate written reports to Molinari on August 29, 1994, and September 8, 1994, respectively. Masters concluded that Hagemann's charges were unsubstantiated. O'Hara found that Watkins was dissatisfied with the treatment accorded him by Covino and Blohm, that Covino and Blohm had been insensitive toward Watkins, and that their insensitivity was *not* racially motivated. O'Hara concluded that Hagemann's allegations were "partially sustained."

According to O'Hara, Molinari stated on September 7, 1998, prior to receiving O'Hara's report, that he was going to fire Hagemann. Molinari fired Hagemann on September 9, 1998, after Hagemann declined the opportunity to resign.

Hagemann's termination and the events surrounding it received widespread news coverage. Molinari granted interviews to several news agencies, during which he repeatedly stated that Hagemann had performed his job exceptionally well. On October 2, 1994, Molinari broadcast his position regarding Hagemann's allegations of racial insensitivity on the "Borough Hall News & Views" program. Molinari claimed Hagemann's actions were "irresponsible." He described Hagemann's accusations as "malicious," "baseless" and "ill-tempered," and he stated that "there was absolutely no substantiation of racial charges." Molinari further stated that he felt Hagemann's accusations were ironic because he had "admonished" Hagemann for his own racial insensitivity toward a co-worker in 1992.

Hagemann states that Molinari did not admonish him in 1992. Instead, according to Hagemann, Molinari acknowledged that Hagemann was not responsible for the wrongdoing, but asked him to apologize to his coworker on behalf of the Office.

In the fall of 1994, Covino sued Hagemann for defamation. Hagemann's motion to dismiss that case was granted. *See Covino v.*

*Hagemann,* 165 Misc.2d 465, 627 N.Y.S.2d 894 (Sup.Ct. Richmond County 1995).

## DISCUSSION

Motions for summary judgment are granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 1. First Amendment Claim

■ Hagemann claims that he was fired in retaliation for his allegations of racial insensitivity in violation of the First Amendment. Government employees have a limited right under the First Amendment to speak out on matters of public concern. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). To plead a *prima facie* case that they were fired in violation of their First Amendment rights, government employees must establish that their speech can be " 'fairly characterized as constituting speech on a matter of public concern' " and "that the speech was at least a 'substantial' or 'motivating' factor in the discharge." *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied.,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993) (citation omitted). The first element is a question of law; the second is a question of fact. *See id.*

■ If an employee establishes both elements, the employer may still prevail if he or she can show that the employee's conduct was potentially disruptive to the work environment. *See id.* The employer's prediction of disruption must be reasonable, the potential for disruption must outweigh the value of the speech, and the employer must discharge the employee based on a fear of disruption and not in retaliation for the speech. *See Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995). "[I]t matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision; such 'retaliatory' discharge is always unconstitutional." *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.1996).

■ Hagemann argues that his complaints of racial insensitivity toward Watkins touched on a matter of public concern. Defendants, however, maintain that Hagemann's notes did not involve a matter of public concern because they were written in response to a personal disagreement and with the expectation of receiving a personal apology. To determine whether an employee's speech involves a matter of public concern, a court must decide whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. This requires an analysis of the "content, form and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. If the speech concerns an employee's essentially private complaint, rather than a matter of public interest, that weighs against a finding of public concern. *See Luck v. Mazzone,* 52 F.3d 475, 477 (2d Cir.1995).

■ Hagemann did not complain of employment practices that affected him directly. *Cf. Luck* 52 F.3d at 477 (complaint about the lack of air conditioning did not touch on a matter of public concern); *Hickey–McAllister v. British Airways,* 978 F.Supp. 133, 138 (E.D.N.Y.1997) (complaint of single incident of harassment by public official considered a personal grievance). Rather, he spoke in support of a widely known figure on Staten Island and against racial insensitivity by government employees. That Hagemann characterized defendants' conduct as racial insen-

sitivity as opposed to racial discrimination, and that he requested an apology as opposed to something more, is immaterial. The clear implication of Hagemann's note was that Covino and Blohm had behaved improperly toward Watkins because of his race, and Hagemann's demand for an apology was made "in the interest of preserving good relations with the black community." The disclosure and attempted remediation of racially insensitive behavior by government employees cannot be viewed as anything other than a matter of public concern. *See Patrick v. Miller* 953 F.2d 1240, 1247 (10th Cir.1992); *Harris v. Bd. of Public Utilities,* 757 F.Supp. 1185, 1193 (D.Kan.1991).

■ Since it is undisputed that Molinari said he would fire Hagemann if his allegations proved false, and Molinari did in fact fire Hagemann the day after O'Hara issued his report, Hagemann has raised a factual issue as to whether his speech was a substantial or motivating factor in his discharge. It is not necessary to consider whether defendants can meet their burden of establishing that Hagemann's notes had a potentially disruptive effect on the office work environment because, even if they can, Hagemann has raised a factual issue as to retaliation. Defendants argue that the history of morale problems in the Office, coupled with the personal and acrimonious nature of Hagemann's notes, led Molinari to reasonably conclude that Covino and Blohm could no longer work with Hagemann. In response, Hagemann notes that Blohm said she thought he had acted in good faith. Hagemann also argues that, had Molinari been interested in preventing further disruption, he could have responded to Hagemann's offer to resolve the dispute amicably. Given that Molinari's immediate reaction upon reading the notes was to tell several people he would fire Hagemann if his allegations proved false, a rational fact finder could reasonably conclude that Molinari's claims of disruption were merely a pretext for his feelings of antipathy toward Hagemann's speech.

■ It remains to consider Molinari's defense of qualified immunity. A government employer is entitled to qualified immunity for violations of the First Amendment if the employer did not act in violation of a "clearly established" right. *See Hickey–McAllister,* 978 F.Supp. at 136. "For purposes of qualified immunity, a right is 'clearly established' if it is defined with reasonable clarity; if the Supreme Court or the Court of Appeals for the Second Circuit has affirmed its existence; or if a reasonable defendant would understand from existing law that his acts were unlawful." *Id.* at 136–37 (citation omitted). Hagemann's First Amendment right to speak out about racial insensitivity at a public office was well established. *See e.g., Patrick,* 953 F.2d at 1247. Whether Molinari could reasonably have believed that the potential for disruption outweighed the value of Hagemann's speech is an issue of fact. If the reason for Molinari's desire to terminate Hagemann was a lack of trust in his willingness to remain silent about potential racial insensitivity, such a consideration could not outweigh Hagemann's speech and a public official could not reasonably believe that it would. Most importantly, assuming the facts are as Hagemann asserts, no reasonable public official could have thought that, even if there was a potential for disruption, he nonetheless was entitled to retaliate against Hagemann. Accordingly, Hagemann has raised a factual issue with respect to the qualified immunity defense, and his First Amendment claim survives defendants' motion for summary judgment.

### 2. Due Process Claim

■ Hagemann argues that Molinari violated his right to due process by impugning his honesty and professional competence in the media without affording him an opportunity to rebut the charges. A plaintiff alleging a violation of procedural due process must establish a deprivation of a constitutionally protected liberty interest. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "It is well-settled that an individual's liberty [interest is] implicated when a governmentally imposed stigma restricts his ability to seek and obtain employment." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 446 (2d Cir.1980). To establish a restriction in ability to obtain employment, employees must

prove that their employers published stigmatizing information regarding their termination which is, at least arguably, false. *See Esposito v. Metro–North Commuter Railroad Co.*, 856 F.Supp. 799, 803–4 (S.D.N.Y. 1994). An employer's allegations are considered stigmatizing if they "call into question the employee's 'good name, reputation, honor, or integrity.'" *Quinn*, 613 F.2d at 446 (citation omitted). Employees also must prove that "a governmentally imposed stigma [has] restrict[ed] ... [their] ability to seek and obtain employment." *Id.*

 Hagemann argues that Molinari's statements that Hagemann made "baseless", "malicious" and "ill-tempered" claims that were a "figment of [his] mind," damaged his reputation and integrity and called into question his competence as an investigator. By contrast, defendants maintain that, given Molinari's public praise for Hagemann's abilities, the accusations did not strike at the heart of Hagemann's professional competence. Defendants further argue that, because Hagemann's allegations were false, Molinari's charges against Hagemann were within Hagemann's power to correct and, thus, did not implicate a liberty interest.

Molinari's comments were clearly stigmatizing. Though Molinari never accused Hagemann of incompetence, Molinari's comments called into question Hagemann's probity, integrity, and judgment, qualities of significance to Hagemann's work as an investigator. Also, whether or not Hagemann's allegations were false remains in dispute. Though Masters and O'Hara both concluded that Covino and Blohm were not racially insensitive, Hagemann has provided evidence of the legitimacy (and of his good faith belief in the legitimacy) of his allegations. According to Hagemann, Watkins told him that Covino and Blohm had each made racially insensitive remarks about Watkins in the past and that they both had a history of avoiding him and failing to return his telephone messages. This same evidence raises a factual issue as to the veracity of Molinari's allegations against Hagemann.

It remains to be considered whether Molinari's stigmatizing comments restricted Hagemann's ability to find a job. Hagemann testified that, following his termination, he "constantly" sent out resumes and had at least one interview but did not receive any job offers. He further testified that he was told by Carl Grillo, a potential, non-governmental employer, that several City agencies were "precluded" from hiring him because of the circumstances surrounding his termination. Since Grillo's statement is hearsay, it cannot be used to defeat summary judgment, and defendants contend that Hagemann cannot point to any additional evidence, aside from Grillo's statement, to support his claim that Molinari's statements restricted his ability to obtain work.

 The issue whether Hagemann's testimony as to his unsuccessful efforts to find work, accompanied by Molinari's admissions as to his competence, are sufficient to create an inference that Molinari's speech affected Hagemann's ability to find work need not be resolved.[2] Hagemann cannot in any event establish that he was deprived of due process. When reviewing alleged procedural due process violations, a court must distinguish between claims based on established state procedures and claims based on random, unauthorized acts by state employees. *See Hellenic American Neighborhood Action Committee v. City of New* York, 101 F.3d 877 (2d Cir.1996). Where the alleged deprivation is based on random unauthorized acts, the Due Process Clause is not violated unless the State deprives an individual of a postdeprivation remedy. *See id.; Federico v. Bd. of Educ.*, 955 F.Supp. 194, 201 (S.D.N.Y.1997).

---

2. The degree of proof needed to support this element of a due process claim is unclear. On the one hand, discharged employees must prove that they were restricted from other employment opportunities as a result of the stigma imposed by their employers' speech. *See Quinn*, 613 F.2d at 446; *Esposito*, 856 F.Supp. at 804. On the other hand, where discharged employees have established stigmatizing behavior, the likelihood of uncovering direct proof that such behavior affected their ability to find work is small. Rather, as in cases involving racial discrimination, *see Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991), circumstantial evidence, such as that offered here, may be all that is available.

In this context, Molinari's public accusations against Hagemann constitute random unauthorized acts. Given the existence of the "Borough Hall News and Views" program, it is reasonable to assume that Molinari used the media to explain his views on a regular basis, and he was obviously authorized to do so. However, he was not authorized to make defamatory remarks on television regarding a former employee. *See Hellenic,* 101 F.3d 877 (New York City mayor's decision to unilaterally terminate two contracts with plaintiff without authority to do so constituted random act); *Federico,* 955 F.Supp. at 201 (statements made about a teacher by Board of Education members constituted random acts). As explained above, Hagemann has provided sufficient evidence to raise a question as to the accuracy of Molinari's statements. Given that Molinari's accusations were unauthorized, a postdeprivation remedy would have been sufficient, and the Second Circuit has held on numerous occasions that a NYCPLR Article 78 proceeding is an adequate postdeprivation remedy. *See Hellenic,* 101 F.3d at 881. Clearly, a predeprivation hearing under the circumstances would have been impractical, if not impossible. Thus, Hagemann's due process claim fails as a matter of law.

### 3. Section 1981 Claim

Hagemann argues that he was terminated for attempting to vindicate Watkins' contractual rights in violation of 42 U.S.C. § 1981. Section 1981 provides in pertinent part: "(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Non-minority plaintiffs, such as Hagemann, may recover damages pursuant to Section 1981 for retaliation based on their efforts to vindicate the rights of a racial minority. *See Choudhury v. Polytechnic Instit. of New York,* 735 F.2d 38, 42–3 (1984). To establish a *prima facie* case of discrimination under Section 1981, employees must prove that they engaged in a protected activity that their employer knew about, that the employer harmed them in their employment, and that a retaliatory motive played a part in the employer's adverse employment

decision. *See Taitt v. Chemical Bank,* 849 F.2d 775 (2d Cir.1988).

Hagemann's Section 1981 claim fails as a matter of law because Watkins was not a party to any contract with the Office. *See Murray v. National Broadcasting Co., Inc.,* 844 F.2d 988, 995 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988). The New York State Court of Appeals follows the definition of third party beneficiary set forth in the Restatement 2d of Contracts: A person is regarded as an intended (third party) beneficiary if "(1) performance of the underlying promise will satisfy an obligation of the promisee to pay money to the beneficiary, or (2) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." 22 *New York Jurisprudence 2d,* Contracts § 304 at 390 (1996). Since the sole purpose behind the contracts involved here was to provide funding to the Rising Stars, the Rising Stars was a third party beneficiary to the contracts. Hagemann argues that, because "Ed Watkins *was* [the] Rising Stars in every material respect," a rational jury could find that he also was a third party beneficiary. Hagemann's argument is without merit. Hagemann acknowledges that Watkins coached the Rising Stars on a volunteer basis. Hagemann's argument merely suggests Watkins' importance to the Rising Stars. It does not create an issue of fact as to whether Watkins was the intended beneficiary of the contracts. *Cf. Plumbing Indus. Bd. Plumbing Local Union No. 1 v. L & L Masons, Inc.,* 927 F.Supp. 645 (S.D.N.Y. 1996) (labor union not a third-party beneficiary of collective bargaining agreement that purportedly bound contractor to contribute to union's employee benefit plan). Accordingly, Hagemann's Section 1981 claim fails as a matter of law.

### 4. Conspiracy Claims

Hagemann claims that Molinari and Covino conspired to terminate him for exercising his First Amendment rights and to punish him for attempting to vindicate the rights of Watkins in violation of 42 U.S.C. §§ 1985(3) and 1983. Defendants argue that, because Molinari and Covino worked in the

same office, and were acting within the scope of their employment, as a matter of law they could not conspire. *See Philippeaux v. North Central Bronx Hosp.*, 871 F.Supp. 640, 656 (S.D.N.Y.1994), *aff'd.* 104 F.3d 353 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1110, 137 L.Ed.2d 312 (1997). Hagemann argues that the intra-corporate conspiracy doctrine does not apply where "each defendant possessed independent, personal conspiratorial purposes." *Yeadon v. New York City Transit Authority,* 719 F.Supp. 204, 212 (S.D.N.Y.1989).

■ There is no need to decide whether the intra-corporate conspiracy doctrine applies here because Hagemann has failed to raise a factual issue as to conspiracy. In order to defeat a motion for summary judgment, a plaintiff must produce more than conclusory allegations or naked assertions of conspiracy. The plaintiff must set forth specific facts tending to show concerted action. *See Niemann v. Whalen,* 911 F.Supp. 656, 664 (S.D.N.Y.1996). Here, Hagemann claims that Covino and Molinari conspired to fire him during a "secret" meeting in July 1994, when Molinari told Covino that the allegations of racial insensitivity had not been substantiated. In support of his allegations, Hagemann points out that Covino called Watkins a "dinge"; that Covino requested in writing that Molinari discipline Hagemann for making unfounded allegations of racial discrimination; and that Molinari urged Covino to sue Hagemann after his termination. Hagemann can point to no evidence, however, that Molinari and Covino actually planned to fire him during the July meeting. To the contrary, Covino stated during a deposition that he did not ask Molinari to fire Hagemann and that he was not concerned whether Hagemann was fired so long as he was disciplined. In addition, it was both reasonable and expected that Covino and Molinari would meet to discuss the outcome of the investigation. *See San Filippo v. U.S.*

*Trust Co. of New York, Inc.,* 737 F.2d 246, 256 (2d Cir.), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985) (no genuine issue of conspiracy where prosecutor and detective met with witnesses prior to their appearances before the grand jury). *Cf. Niemann,* 911 F.Supp. at 664–65 (conspiracy claim survived where plaintiff provided evidence that alleged conspirators jointly threatened her during a meeting). Labeling the meeting "secret", where there is no evidence that any effort was made to hide the fact of the meeting, does not raise an inference of conspiracy. Hagemann's claim of conspiracy is based entirely on speculation, and it fails as a matter of law.

### 5. Defamation Claim

■ Hagemann's defamation claim arises from Molinari's statement, made on the "Borough Hall News & Views" program, that Hagemann's accusations against Covino and Blohm were ironic because Molinari had previously admonished Hagemann for racial insensitivity. Molinari states that the statements he made on television were true.[3] Hagemann states that Molinari never admonished him for racial insensitivity and, therefore, that Molinari's statements on television were false. Viewing the evidence in the light most favorable to Hagemann, there exists a factual issue as to Molinari's veracity on the "Borough Hall News & Views."

■ Molinari asserts defenses of absolute[4] and qualified privilege. High ranking officials are afforded absolute immunity from liability for defamatory statements made during the discharge of their official responsibilities. *See Stukuls v. State of New York,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829 (1977); *Lombardo v. Stoke,* 18 N.Y.2d 394, 276 N.Y.S.2d 97, 222 N.E.2d 721 (1966). In *Lombardo,* the New York State Court of Appeals held that the president of Queens College was entitled to absolute privilege for making a public statement denying accusa-

---

**3.** Defendants also argue that Molinari's statements were not of a defamatory nature. However, because defendants did not raise this argument until their reply brief, thereby denying Hagemann the right to respond, it is assumed for purposes of the motion that Molinari's statements were defamatory.

**4.** There being no objection to defendants' motion to amend the answer to assert a defense of absolute privilege, the motion is granted.

tions of anti-Catholic bias that had received widespread news coverage. The Court found that, "[c]onsidering the widespread newspaper coverage given to the charges of bias, the propriety, indeed the necessity, of a public statement by the board may hardly be doubted." *Id.* at 401, 276 N.Y.S.2d 97, 222 N.E.2d 721. Hagemann attempts to distinguish this case from *Lombardo* on the grounds that Molinari himself leaked Hagemann's termination to the media and that Hagemann's complaint was an attack upon Covino and Blohm, not upon the integrity of the Office. Hagemann's assertion that Molinari leaked the story to the press is purely speculative. Moreover, since an attack upon high-ranking government employees lowers public confidence in the office in which they work, it should be considered an attack upon the entire office. Given the widespread publicity of Hagemann's charges of discrimination, the "propriety" of a public statement "may hardly be doubted." *See Kilcoin v. Wolansky,* 75 A.D.2d 1, 10, 428 N.Y.S.2d 272 (2d Dep't. 1980). Accordingly, Molinari is entitled to absolute immunity from Hagemann's defamation claim.

### 6. Whistleblower Claim

 Hagemann's final claim is that he was discharged in retaliation for attempting to vindicate Watkins' rights in violation of New York's "whistleblower" statute, Civil Service Law § 75–b. Section 75–b(2)(a)(ii) prohibits a public employer from taking adverse personnel action against an employee who discloses information the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action. " 'Improper governmental action' shall mean any action by a public employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation." § 75–b(2)(a)(ii).

 Defendants argue that Hagemann has failed to raise a factual issue as to his belief in the improper nature of their conduct because he previously denied accusing Covino and Blohm of violating the law.

The doctrine of judicial estoppel bars "a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island Railroad Co.,* 997 F.2d 1028, 1037 (2d Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). In this Circuit, the application of the doctrine is appropriate only where two elements are satisfied. It is not enough that the party against whom the estoppel is asserted has argued an inconsistent position in a prior proceeding; the prior inconsistent position must have been "adopted by the court in some manner." *Id.* at 1038.

Hagemann's position in Covino's defamation suit was inconsistent with his position here. In his reply memorandum in support of his motion to dismiss that suit, Hagemann argued that the note made no mention of Covino's "being 'guilty of a crime' or engaging in unlawful race discrimination", and, he explained: "that the Note seeks an *apology*—and nothing more—is clear evidence that it could not reasonably be read to impute criminal conduct. No one seeks an apology for what he regards as criminal or other serious charges of misconduct." Hagemann now contends that only a jury can decide whether he believed he was reporting discrimination. However, given his prior admissions that the note did not mention "unlawful race discrimination," and that Covino and Blohm did not engage in any "serious . . . misconduct," it is inconsistent to assert a belief now that the note charges them with unlawful discrimination against Watkins.

Nonetheless, the doctrine of judicial estoppel is inapplicable here because Hagemann's prior assertions were not sufficiently adopted by the state court to invoke the doctrine. Though the court found that Hagemann had not made accusations of criminal activity, the court also noted that Hagemann had threatened to report defendants' behavior to the New York City Commission on Human Rights. Since that agency does not have criminal jurisdiction, the court found that Hagemann's comments were not outside the constitutional protections afforded opinions. But the court's decision to dismiss the complaint did not depend upon a finding that

Hagemann had not accused Covino of non-criminal but nonetheless serious misconduct within the meaning of the whistleblower law. *See Covino v. Hagemann,* 165 Misc.2d 465, 627 N.Y.S.2d 894, 898–99 (Sup.Ct. Richmond County 1995). Accordingly, although Hagemann's inconsistent positions may well undermine his position before the trier of fact in this case, his whistleblower claim survives defendants' motion for summary judgment.

## CONCLUSION

Defendants' motion for summary judgment is denied as to plaintiff's First Amendment and whistleblower claims and granted as to all other claims, which are hereby dismissed.

**SO ORDERED.**