Gwendolyn L. GREGORY, as Executrix under the Will of Joseph Morgan Gregory, Deceased, Plaintiffs,

v.

The GARRETT CORPORATION; Colt Electronics Co., Inc.; Phoenix Aerospace, Inc.; and Lockheed Corp., Defendants.

The GARRETT CORPORATION and Lockheed Corporation, Third-Party Plaintiffs,

v.

TEXASGULF, INC. and TexasGulf Aviation, Inc., Third-Party Defendants.

No. 82 Civ. 2316 (GLG).*

United States District Court, S.D. New York.

Dec. 16, 1983.

As Amended Jan. 11, 1984.

See also D.C., 578 F.Supp. 871.

## MEMORANDUM DECISION

GOETTEL, District Judge.

Third-party defendants TexasGulf, Inc. ("TG"), and TexasGulf Aviation, Inc. ("TGA"), move the Court for summary judgment and dismissal of the third-party complaints filed on behalf of defendants Colt Electronics Co., Inc. ("Colt"), The Garrett Corporation ("Garrett"), Lockheed Corporation ("Lockheed"), and the United States. TG. and TGA argue that six of the eight plaintiffs involved in this multi-action litigation have signed releases that relieve TG and TGA not only of any tort liability to those plaintiffs but also of any liability for contribution to the defendants.[1] TG and TGA further contend that the defendants' indemnity claims must be dismissed as well because there is no evidence of a contract

---

1. TG's and TGA's other motion for summary judgment, which is based on a workers' compensation defense, is discussed separately in an opinion published simultaneously with this memorandum decision.

for indemnity and no suggestion that the defendants were merely vicariously negligent and thereby entitled to indemnification by operation of the law. The defendants respond that summary judgment is inappropriate because issues of fact remain concerning the validity of the releases that the six plaintiffs have signed and the nature of each defendant's liability. As discussed below, the Court concludes that the defendants have indeed identified several material issues of fact and that this motion for summary judgment must, therefore, be denied.

FACTS

The following is a summary of the facts relevant to this motion.[2] On February 11, 1981, six passengers and two flight crew members on board corporate aircraft N520S, a Lockheed 731 Jetstar, were killed when it crashed while attempting to land at Westchester County Airport just north of White Plains, New York. The six passengers were key employees of TG, and the two flight crew members were agents of TGA, the subsidiary of TG that allegedly owned and operated the JetStar.

During the months that followed the crash, the surviving spouses of six of the individuals who died therein (the "survivors")[3] entered into settlement negotiations with TG and TGA. The centerpiece of those negotiations appears to have been United States Aircraft Insurance Group's Policy No. 360AC–31431 (the "USAIG Policy"). That policy was a key part of TG's and TGA's employee benefits program and

was also intended to protect TG and TGA from any liability incurred through the operation of TGA aircraft. Under the Voluntary Settlement Endorsement provision of the policy, the survivor of a TG or TGA employee killed in the crash of a TGA aircraft could receive up to $250,000, but only on the condition that the survivor signed a release of all of TG's and TGA's liability under the policy.

■ What was apparently much less discussed during the negotiations was the six survivors' possible entitlement to additional benefits under American Home Assurance Company's Business Travel Accidental Death and Dismemberment Insurance Policy (the "Travel Policy"). Under this second policy, which was another key facet of TG's and TGA's employee benefits program, the survivor of an employee was entitled to compensation if the employee was killed while traveling on company business, but apparently only if while traveling in an aircraft not owned or operated by TG.[4] Recovery under the Travel Policy was equal to six times the deceased employee's annual salary, up to a maximum of $250,000, and was apparently available without the survivor having to sign a release.

Despite the fact that the representatives of TG and TGA allegedly told the plaintiffs either that the Travel Policy was not applicable under the circumstances of this particular accident or that it merely provided the same coverage as did the USAIG policy, the final releases did refer to the Travel

---

2. A somewhat more extensive description of the parties and facts involved in the twenty-one related actions that make up this litigation may be found in the opinion referred to above. See *supra* note 1.

3. The six survivors are: Susan Winter Woodling, Mary L. McKee, Carolyn E. Claydon, Mary Drew, Gwendolyn L. Gregory, and Judith N. Sorenson.

4. More precisely, the policy excluded coverage of accidents occurring while employees were traveling in an aircraft "owned or operated by the *Policyholder.*" For purposes of this motion only, however, the Court must assume that the non-moving defendants are correct in their contention that only TG could be considered the

"policyholder" at the time of the accident. While TG and TGA do refer the Court to a copy of what appears to be the 1983 renewed policy, which indicates that TG and all of its subsidiaries now constitute the policyholder, Garrett's exhibit, which is a copy of what appears to be the renewed policy for the years 1978 through 1981, states that the policyholder at the time of the accident was TG alone. Although TG and TGA contend that it was only by mistake that reference to TG's subsidiaries was omitted from the policy at the time of the accident, sufficient doubts are raised by the parties' exhibits to create a genuine issue of fact as to who the policyholder was.

Policy and obviously were intended by TG and TGA to relieve themselves of any liability they might have under both policies. Now, because it is contended that the Travel Policy might actually be applicable, two of the plaintiffs, Woodling and Claydon, and four defendants are claiming that the releases are invalid since the plaintiffs were not fully apprised of their rights and thus were fraudulently induced into signing the releases. It is also argued that the releases are invalid on the separate ground that they were granted in exchange for either too little or no consideration, depending upon the particular plaintiff.[5]

TG and TGA claim that they believed at the time and still believe now that the Travel Policy was not applicable because the deceased were involved in a situation which was intended to be covered by the USAIG policy only. When the two policies were originally purchased, years before the crash, TGA existed not as a separate corporate entity, but rather as the aviation department of TG, and TG was the sole owner and operator of all corporate aircraft used to transport its employees. Thus, when it purchased the two insurance policies its plan appears to have been that the USAIG Policy would cover any liability incurred as a result of the operation of its aircraft and that the Travel Policy would cover all other business-related travel accidents. Later, TG and TGA claim, after TGA was created and ownership of the aircraft was transferred to it, the first of a series of renewals of the Travel Policy reflected the transfer of ownership but subsequent renewals, by mistake, did not. *See supra* note 4. As a consequence, argue TG and TGA, although through inadvertence the policy was not in technical conformity with what TG, TGA, and American Home Assurance Company intended, there could be no doubt that the intention was for the policy to exclude from its coverage any accidents involving employees traveling in TGA aircraft. Accordingly, TG and TGA now insist that their representations to the survivors about the inapplicability of the Travel Policy were true, the releases were granted in exchange for fair consideration, and they are valid and do serve as a bar to both the plaintiffs' and the defendants' claims.

The four defendants and two plaintiffs respond that the Travel Policy was applicable because the deceased were traveling in a TGA aircraft, TGA was a corporation separate from TG, the Travel Policy did not exclude accidents involving TGA aircraft, and during the negotiations TG and TGA knew these facts and failed to communicate them to the survivors. Because of these misrepresentations, contend the defendants, the releases are now invalid and cannot serve to bar the defendants' contribution claims.

## DISCUSSION

■ All parties seem to agree that if the releases are valid, they serve to bar the defendants' third-party contribution claims against TG and TGA. This is so whether the law of New York, Connecticut, or North Carolina applies. *See* Conn.Gen. Stat.Ann. § 52–572e (Supp.1983–84); N.Y. Gen.Oblig.Law § 15–108(a) (1978); N.C. Gen.Stat. § 1B–4(2) (1969).[6] Furthermore, everyone seems to agree that if the releas-

---

**5.** This contention is based upon the argument that if, as the defendants say, the survivors had known that they arguably had a right to $250,-000 under the Travel Policy without having to sign a release, they would never have released TG and TGA from liability under the USAIG Policy without having been paid some consideration in exchange. It should be noted, however, that at least with respect to Mrs. Sorenson and Mrs. Woodling, their deceased husbands' incomes may not have been enough to entitle them to the $250,000 maximum that is allowable under the Travel Policy. In these two cases then, the defendants concede that at least partial

consideration may have been paid for the signed releases.

**6.** Although the Court ultimately may have to decide choice of laws issues concerning contribution, which is permitted under the law of New York and North Carolina but not under that of Connecticut, and the amount by which any judgment against the defendants would be offset because of the plaintiffs' releases, the Court agrees with TG's and TGA's point that there is no need to resolve these issues at this time.

es were not entered into in good faith, then they are now invalid and cannot constitute a bar to the defendants' contribution claims.

■ Where the parties do not see eye to eye is on the issues of whether the JetStar was either factually or legally a TG aircraft, whether the Travel Policy did cover the decedents, whether TG's and TGA's agents did misrepresent the applicability of that policy, and ultimately whether the releases were entered into in good faith and are valid. The problem is that these are genuine issues of material fact, which render "the procedural weapon of summary judgment inappropriate" and require instead a full evidentiary hearing.[7] *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980); *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975).

For similar reasons, the Court cannot determine on a summary judgment motion the validity of the defendants' indemnity claims against TGA. Although there is much appeal to the argument of TG and TGA that a finding of vicarious, as opposed to active, negligence on the part of any of the defendants is a very unlikely prospect, that is no reason to attempt to decide the matter prior to a full trial on the question of the relative liability of each party.

Accordingly, this motion for summary judgment must be and is denied.[8] A full evidentiary hearing on the issues raised herein shall be held as soon as the Court's trial calendar permits.[9]

SO ORDERED.

---

7. Although TG and TGA do raise an interesting legal question as to the limited grounds on which non-parties to a release are permitted to challenge that release, the Court assumes for a number of reasons that the defendants do have standing in this situation. In the first place, they have challenged the releases, even if in a very weak manner, on the one ground that even TG and TGA recognize as valid, namely: collusion between the parties to the releases. In the second place, the defendants' major challenge on the grounds of misrepresentation and lack of consideration is joined by at least two of the plaintiffs, and no one is questioning their standing to attack the releases on those two grounds. Hence, the issues are already validly raised and ought to be resolved at trial if risk of inconsistent findings is to be minimized. Finally, the Court remains unconvinced that the defendants lack standing to challenge the releases on the grounds of misrepresentation and lack of consideration. While there is undoubtedly authority for the proposition that the primary way to

attack the good faith of those who have entered into a release is to show collusion, *see, e.g., Franzek v. Calspan Corp.*, 78 A.D.2d 134, 141, 434 N.Y.S.2d 288, 292 (4th Dep't 1980), the Court is not persuaded that such is the only way to establish bad faith. The Court cannot at this point fathom why proof of misrepresentation and lack of consideration should not also be construed as evidence of bad faith.

8. A cross-motion for summary judgment filed by defendant Colt is denied for the same reasons that the original motion is denied.

9. Although the opinions of all parties as to the advisability of a bifurcated trial have already been solicited once, the Court will shortly renew that solicitation in order to determine whether the denials of this motion and the companion motion concerning TG's and TGA's workers' compensation defense give cause for amendment of any of the recommendations and requests already submitted.