Joyce ROBINSON, as Successor in interest and surviving heir to decedent, Vernon Miller, Plaintiff,

v.

ADIRONDACK MEDICAL CENTER; John A. Esper, M.D., as an individual and in his official capacity at the Adirondack Medical Center; C. David Merkel, M.D., as an individual and in his official capacity at the Adirondack Medical Center; and Jay Federman, M.D., as an individual and in his official capacity as Medical Director of the Adirondack Medical Center, Defendants.

No. 01–CV–0655.

United States District Court, N.D. New York.

Feb. 7, 2003.

Smith, Hirsch, Blackshear & Harris, PLC, Attorney for Plaintiff, Nashville, TN, Fannie J. Harris, Esq.

Thuillez, Ford, Gold & Johnson, LLP, Attorneys for Defendants Adirondack Medical Center, John A. Esper, M.D., and Jay Federman, M.D., Albany, Donald P. Ford, Esq.

Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C., Attorneys for Defendant C. David Merkel, M.D., Albany, Blair W. Todt, Esq., Joseph Amicone, Esq., Of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Joyce Robinson commenced the instant medical malpractice action on May 4, 2001, arising out of the death of her son, Vernon Miller ("Miller"). Defendants Adirondack Medical Center ("AMC"), John A. Esper, M.D. ("Dr.Esper"), and Jay Feder-

man, M.D. ("Dr.Federman") now move for summary judgment pursuant to Fed. R.Civ.P. 56 seeking dismissal of the Complaint in its entirety.[1] Plaintiff opposes. Plaintiff also moves to continue the trial date and to retain an alternate expert. Defendants oppose. Oral argument was heard on September 27, 2003, in Albany, New York. Decision was reserved.

## II. FACTS

On May 30, 1999, Miller was incarcerated at the Federal Correctional Institute in Ray Brook, New York ("FCI Ray Brook"). (Pl.'s Resp. to Defs'. Stmnt. of Mat. Facts at ¶ 1.)[2] At approximately 8:30 p.m. on May 30, 1999, another inmate stabbed Miller in the left anterior chest, just below the collar bone. (*Id.* at ¶ 2; Pl. Exs. 1, 3.) Miller was transported via ambulance to the AMC. (Pl.'s Resp. ¶ 3.) Dr. Esper, an employee of AMC, was notified of Miller's injury and condition before the ambulance arrived at the hospital. (Def. Ex. E— Esper Aff. at ¶ 4.) Dr. Esper then notified a surgeon, C. David Merkel, M.D. ("Dr.Merkel"), who was present in the hospital, about Miller's imminent arrival. (*Id.*) Dr. Merkel is a private physician with admitting privileges at the hospital. (Def Ex. J; Sarr Aff. at ¶ 2)

There are numerous discrepancies in the record regarding the timing of events. Records indicate that Miller arrived in the emergency room sometime between 9:10 and 9:24 p.m. Dr. Esper was the emergency room physician who cared for Miller upon his arrival at the emergency room. (Esper Aff. at ¶ 4.) As part of the emergency care, Dr. Esper ordered a portable chest x-ray, a Foley catheter and the ad-ministration of blood, oxygen, and intravenous fluids. (*Id.* at ¶¶ 5, 6.) Dr. Merkel also was present in the emergency room. (Pl.Ex. 2.) At approximately 9:32 p.m.,[3] Dr. Merkel placed "[a] chest tube . . . through a midaxillary stab wound." (Pl.Exs.1, 2.) Blood was provided to Miller. (*Id.*) At approximately 9:53 p.m., Miller was given a third unit of blood and was awaiting transfer to the operating room. (Pl.Ex. 2.) At approximately 10:05 p.m., Miller was transferred to the operating room. (Def.Ex. F.) At approximately 10:15 or 10:17 p.m., Miller suffered cardiac arrest. (Pl.Ex. 3.) CPR was started. (*Id.*) Dr. Esper performed a needle pericardiocentesis. (Esper Aff. at ¶ 7; Pl.Ex. 1.) Miller's heart was inspected for tamponade, which was not found. (*Id.*) Basic life support was started at approximately 10:20 p.m and terminated at 10:48 p.m. (*Id.*) Miller was pronounced dead at 10:48 p.m. (*Id.*)

## III. STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

**1.** Defendant C. David Merkel, M.D., has not moved for summary judgment.

**2.** Plaintiff's response to defendants' statement of material facts will be referenced as "Pl.'s Resp."

**3.** Again, the actual timing of events is subject to dispute and cannot now be resolved.

(1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut*, 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

## IV. *DISCUSSION*

■ On a motion for summary judgment, the defendants must first make a prima facie showing that they were not negligent in treating plaintiff. *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324–25, 508 N.Y.S.2d 923, 501 N.E.2d 572 (1986). If the defendants satisfy this burden, the plaintiff "must submit evidentiary facts or materials to rebut the prima facie showing by the defendant physician that he was not negligent in treating plaintiff so as to demonstrate the existence of a triable issue of fact." *Id.*

■ Defendants have met this burden by submitting expert affidavits and reports stating that Dr. Esper rendered proper care to Miller. One of defendants' experts, Roger Barrowman, M.D. ("Dr.Barrowman"), stated in his report that:

> Dr. Esper supervised an organized plan of treatment for a trauma victim .... He facilitated the contact of the surgeon and the OR team.... He placed a chest tube in the patient while in the ED [Emergency Department] and decided to take the patient to the OR [operating room]. I believe that was a wise decision at the time. A controlled and better-equipped operating room environment would normally provide a better chance of successful outcome than an ED "crash" thoracotomy. Retrospectively, with the autopsy information, the decision was further supported. The wound clearly required definitive surgical repair, which could not have been performed in the ED. Unfortunately, the patient's wound was so severe that the readiness of the OR was impossible in the short time required.... The issue of elapsed time in the sequence of events may be argued as being excessive and contributing to the patient's death.... I agree that given the patient's injury, there was a brief period of time when he may have been saved and that saving this patient would have required surgery very soon after the initial event. One can only speculate on the exact length of time of this window of opportunity, but in this patient, it was obviously less than the approximately 1 hour and 47 minutes from injury to cardiac arrest.
>
> However, I disagree that providing such care was possible given the circumstances in this case.... [O]pening a patient's chest in a suboptimal environment, i.e., in the field or the ED, is associated with a mortality approaching 100%.... [S]uch a "crash" thoracotomy ... would have been a difficult procedure... and the expertise (and time) necessary to dissect, localize, and repair the bleeding vessel would have precluded anything but an OR procedure.... The emergency care in this case was excellent. The mortality for this type of injury is very high even in large academic urban trauma centers under the best of circumstances. There was no apparent negligent delay in the care rendered.

(Def.Ex. F.)

Defendants also submitted the report of David C. Coletti, M.D. ("Dr.Coletti"), an

expert retained by the non-moving defendant, Dr. Merkel. Dr. Coletti stated in his report that:

I think the damage suffered with this blood loss and the inability to readily control the bleeding at the scene [*i.e.*, at FCI Ray Brook] or in the transfer [to AMC], would account for [Miller's] demise.... I also would submit that if this patient had arrived at a Level III trauma center, unless there were people in an Operating Room in the Emergency Room, they wouldn't have been able to respond any faster than what was done [here].

However, the bottom line is I don't think if they had been able to send him to the Operating Room any sooner, that they would have been able to do anything more than they did within the short period of time after he arrived in the Emergency Room....

I believe the problem was unsalvageable within a fairly short period of time.... This injury needed care within minutes which would have been impossible under the best of circumstances....

The fact that the patient expired in my estimation is not a reflection on the effort and expeditious care this patient was given, but rather a reflection of the severity of the injury that he sustained and the excessive volume of blood he lost before he even arrived at the Emergency Room—over at least 50–60 minutes....

I feel that there is absolutely no fault on the part of the facility or the physicians involved.

(Def.Ex. G.)

██ Having made a prima facie showing that the care rendered was not negligent, it is incumbent upon plaintiff to set forth evidence demonstrating a triable issue of fact that defendants were, in fact, negligent, in the care given to Miller. *Alvarez,*

68 N.Y.2d at 324–25, 508 N.Y.S.2d 923, 501 N.E.2d 572 (1986). Plaintiff submits the report of Lloyd Bergner, M.D. ("Dr.Bergner"), wherein he states that:

There are numerous discrepancies throughout the hospital record with respect to "time." Also noted are obvious alterations of certain times in the hospital record. The ... sequence of events in this tragedy can be simply stated as "too little too late." Clearly, the patient was slowly but surely exsanguinating from a left subclavian artery stab wound. It was not a difficult diagnosis to make, and the diagnosis was made early on. Unfortunately, the thoracotomy and suture of the lacerated left subclavian artery that the patient desperately needed to save his life was not performed in a timely fashion. In spite of receiving blood, it was far from replacing the volume which he lost and continued to lose through the stab wound. Given that the patient was brought to the hospital at 21:10 hours, and had cardiac arrest from blood loss at 22:17 hours, my arithmetic shows that the patient's life could have been saved before that 1 hour 7 minutes elapsed if he had been operated upon within that time frame. Vernon Miller ... was inadequately treated and, as a result, he died.

(Pl.Ex. D.)

In sum, it is Dr. Bergner's opinion that Miller needed an immediate thoracotomy and that defendants waited too long before attempting surgery. Further, it is a reasonable inference that he is of the opinion that it was feasible to successfully perform a thoracotomy, either in the emergency room or the operating room, under the circumstances of this case. Dr. Barrowman opines that a thoracotomy could not have been performed in the emergency room, and that given Miller's condition, the

operating room could not have been prepared quickly enough to save his life. Dr. Barrowman does not, however, state in what time frame surgery needed to be completed. Dr. Barrowman similarly offers no opinion whether, under the circumstances, it would have been necessary to attempt a "crash" thoracotomy in the emergency room. Dr. Coletti apparently is of the opinion that surgery would not have benefitted Miller because it was already too late by the time he reached the emergency room.

Defendants admit that there is a triable issue of fact regarding the timeliness of surgical intervention. (July 18, 2002 Ford Aff. at ¶ 5; June 24, 2002 Ford Aff. at ¶ 6.) They contend, however, that "the liability of John Esper, M.D. and/or the [AMC] . . . is not in any way affected by the outcome of this issue." (July 18, 2002 Ford Aff. at ¶ 5.) Contrary to defendants' assertion, the differences in expert opinions reveal the existence of triable issues of material fact that may affect the liability of Dr. Esper and the AMC. Several questions remain, including the following:

— Was a thoracotomy likely to benefit Miller or was it already too late by the time he reached the emergency room?

— Assuming surgery would have benefitted Miller, within what time frame would the surgery have to have been completed in order to save his life?

— Could a thoracotomy reasonably have been completed in the emergency room?

— When, if ever, did Dr. Esper relinquish the care of Miller to Dr. Merkel?

— Assuming Dr. Esper did relinquish the care of Miller to Dr. Merkel, was it reasonable under the circumstances for him to have done so?

— If a thoracotomy could not reasonably have been completed in the emergency room, what was a reasonable amount of time to prepare the operating room and transfer Miller to the operating room?

— If the operating room could not reasonably have been prepared in time to perform a controlled thoracotomy, should Dr. Esper have attempted to perform a thoracotomy in the emergency room?

Viewing the evidence most favorable to the plaintiff, these are examples of outstanding triable issues of fact that cannot now be resolved in connection with defendants' motion for summary judgment.

With respect to defendant Dr. Federman, plaintiff has offered no evidence that he was involved with the care and treatment of Miller. In addition, plaintiff earlier moved to dismiss the action against Dr. Federman. This motion was rejected because of plaintiff's failure to comply with Fed.R.Civ.P. 31(a)(1) and N.D.N.Y.L.R. 7.1. (*See* Dkt. No. 17.) Based on plaintiff's intent to discontinue the action against Dr. Federman (*see* Dkt. No. 17; Def. Ex. H) and the lack of any evidence supporting the imposition of liability upon him, Dr. Federman's motion for summary judgment shall be granted.

■ Finally, plaintiff moves to continue the trial date and to make a substitute for her expert witness, Dr. Bergner, because of his inability to give live testimony in January 2003, or to give a deposition due to his health condition. A trial date has not been set. There is no need for a continuance of the trial date. Similarly, because there is no indication that Dr. Bergner would be unavailable to give live testimony at a future date, or to attend a deposition, plaintiff has, at this time, failed to demonstrate the need to obtain an alternate expert.

**72**

### V. *CONCLUSION*

Triable issues of fact remain regarding Miller's treatment by Dr. Esper and the AMC. Plaintiff has failed to demonstrate the existence of triable issues of fact regarding the liability of Dr. Federman.

Accordingly, it is

ORDERED that

1. Defendants John A. Esper, M.D.'s and Adirondack Medical Center's motion for summary judgment is DENIED;

2. Defendant Jay Federman, M.D.'s motion for summary judgment is GRANTED and the Complaint is DISMISSED as to him; and

3. Plaintiff's motion to substitute an expert witness is DENIED without prejudice.

IT IS SO ORDERED.